[No. A101941. First Dist., Div. One. Aug. 6, 2004.]

SIERRA CLUB, Plaintiff and Appellant, v.
COUNTY OF NAPA et al., Defendants and Respondents;
BERINGER WINE ESTATES et al., Real Parties in Interest and
Respondents.

**COUNSEL**

Thomas Neil Lippe, Michael W. Graf and Stephen E. Velyvis for Plaintiff and Appellant.

Robert Westmeyer, County Counsel, Laura Jean Anderson and Krishan S. Chopra, Deputy County Counsel, for Defendants and Respondents.

Dickenson, Peatman & Fogarty, David W. Meyer, Linda Emerson; Remy, Thomas, Moose & Manley, James G. Moose and Sabrina V. Teller for Real Parties in Interest and Respondents.

**OPINION**

**STEIN, Acting P. J.**—Sierra Club appeals from a judgment denying its petition for writ of mandate to overturn the decision of the Napa County Conservation, Development, and Planning Department (Department) to certify an environmental impact report (EIR) and issue a use permit to Beringer Wine Estates, Beringer Blass Wine Estates Company and Beringer Blass Wine Estates Holdings, Inc. (Beringer). The use permit will allow Beringer to develop land within Napa County's Airport Industrial Area Specific Plan area,

a project that will result in the loss of .461 acres of seasonal wetlands. Beringer, the County of Napa (County) and the Napa County Board of Supervisors (Board) are the respondents to the appeal.

We affirm.

### Procedural Background

On June 25, 1999, Beringer filed an application for a use permit to develop an integrated winery facility on a 218-acre site located in the Napa County Airport Industrial Area Specific Plan area.

On March 3, 2000, the Department issued a public notice that it would act as lead agency and cause an EIR to be prepared on the project. A draft EIR was circulated from May 25 to July 9, 2001. As relevant here, the draft EIR noted that the project would cause the loss of .461 acres of wetlands that provide a suitable habitat for vernal pool fairy shrimp. No fairy shrimp have been found on the site, but fairy shrimp have been identified in seasonal wetlands adjacent to the site, and for purposes of Beringer's application, it was and is assumed that they are present in all seasonal wetlands on the site, including those that Beringer proposes to fill. The draft EIR set forth measures designed to minimize the impact of the project on the wetlands as the habitat for fairy shrimp, but found that even with the implementation of those measures, the impact would not be reduced to "less than significant." The draft EIR also identified six alternatives to the project. It found three to be infeasible as not meeting Beringer's objectives. It analyzed the environmental effects that would result from the remaining three, at least potentially feasible, alternatives.

On June 27, 2001, the Department conducted a public hearing to review and accept comments on the project. The draft EIR was then revised to provide responses to the public comments. On September 26, 2001, the Department held a second public hearing for the purposes of considering points made in connection with the responses to previously received public comments.

On December 5, 2001, the Department certified the final EIR,[1] and on December 19, 2001, it approved the use permit, with conditions. The Department found that even with the implementation of mitigation measures, the project's effect on the wetlands would be significant and unavoidable, but

---

[1] The final EIR consists of the draft EIR, the final EIR and the related planning and other County records, minutes and files constituting the record of the proceedings conducted prior to certification.

found that this effect would be outweighed by the benefits from the project. The Department further found that the alternatives analyzed by the draft EIR would be infeasible and less desirable than the project.

Sierra Club appealed the Department's decision to the Board. On April 9, 2002, the Board denied the appeal, also finding that the benefits resulting from the project would substantially outweigh its significant effects on the environment.

Sierra Club then filed a petition for writ of mandate in the superior court. The superior court entered judgment denying the petition, and Sierra Club appeals, contending that the use permit violates the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.)[2] and is fatally inconsistent with the Airport Industrial Area Specific Plan (the Specific Plan).

## Standard of Review

■ The inquiry for the issuance of a writ of administrative mandamus is whether the agency in question prejudicially abused its discretion; that is, whether the agency action was arbitrary, capricious, in excess of its jurisdiction, entirely lacking in evidentiary support, or without reasonable or rational basis as a matter of law. (Code Civ. Proc., § 1094.5, subds. (b) & (c); *San Franciscans Upholding the Downtown Plan v. City and County of San Francisco* (2002) 102 Cal.App.4th 656, 673 [125 Cal.Rptr.2d 745] (*San Franciscans*).) A prejudicial abuse of discretion is established if the agency has not proceeded in a manner required by law, if its decision is not supported by findings, or if its findings are not supported by substantial evidence in the record. (*Id.* at p. 674.) "Furthermore, 'when an agency fails to proceed as required by CEQA, harmless error analysis is inapplicable. The failure to comply with the law subverts the purposes of CEQA if it omits material necessary to informed decisionmaking and informed public participation. Case law is clear that, in such cases, the error is prejudicial.' [Citation.]" (*Protect the Historic Amador Waterways v. Amador Water Agency* (2004) 116 Cal.App.4th 1099, 1106 [11 Cal.Rptr.3d 104].) ■ A reviewing court may neither substitute its views for those of the agency whose determination is being reviewed, nor reweigh conflicting evidence presented to that body. (*San Franciscans, supra,* at p. 674.) The decisions of the agency are given substantial deference and are presumed correct. The parties seeking mandamus bear the burden of proving otherwise, and the reviewing court must resolve reasonable doubts in favor of the administrative findings and determination. (*Ibid.*)

---

[2] Except as specifically noted, all further statutory references are to the Public Resources Code.

"In the context of an administrative mandamus action challenging an agency's determination under CEQA or the applicable general [or specific] plan, 'substantial evidence' means 'enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached.' [Citations.] Such substantial evidence may include facts, reasonable assumptions predicated upon facts, and expert opinion supported by facts, but not argument, speculation, unsubstantiated opinion, or clearly erroneous evidence." (*San Franciscans, supra,* 102 Cal.App.4th at p. 675.)

## The Project, Beringer's Objectives and the Project's Impact on Wetlands

The project site, located in the Napa County Airport Industrial Area Specific Plan area, is zoned for general industrial use. Napa County's General Plan designates the property at issue for industrial land use, including "industry, limited commercial and related facilities which are ancillary to the primary industrial uses, agricultural, wineries, [and] no residential uses." The Specific Plan for the area calls for nonnuisance light industrial and office uses, specifically including "cooperage, bottling plants, and wine warehousing and distributing." The General Plan allows a maximum density for industrial uses of 50 percent coverage. The Specific Plan limits the maximum lot coverage for buildings to 35 percent.

The site is at the intersection of South Kelly and Devlin Roads, is adjacent to the Napa County Airport to the south, and is bounded on the east by a right-of-way owned by the Union Pacific Railroad. The land has been used primarily for cattle grazing. The No Name Creek meanders through the western half of the site. Cattle have prevented much riparian growth along the creek and have caused erosion and sloughing, degrading the creek's channel, bed and banks. A ditch runs along the northern perimeter of the property. The southern bank of the ditch is deeply eroded. The site supports a number of seasonal wetlands ranging in size from 0.003 acres to 1.01 acres, with a total area of 4.90 acres. Although no vernal pool fairy shrimp have been found on the site, the wetlands are capable of supporting fairy shrimp, and, for purposes of CEQA review, it has been assumed that fairy shrimp are in fact present.

Beringer proposes to establish a 1,424,400-square-foot facility on the site. 1,167,590 square feet of the facility will be used for warehousing and storing wine. Sixty thousand square feet will be devoted to office, administrative and laboratory uses, and 196,810 square feet will be dedicated to related uses, including grape crushing, blending, bottling and employee areas. Beringer plans to plant a 115-acre vineyard, to be irrigated by the winery's treated

wastewater. It intends to construct three 1-acre ponds for treating winery wastewater and to construct a maximum of nine acres of storage ponds for the purpose of providing reclaimed treated wastewater to irrigate and frost-protect the vineyard and for perimeter landscaping.

Beringer's stated objectives for the facility are to: (1) construct a new winery facility that will provide expansions for barreling, blending, bottling and warehousing to meet growing demands and limit operating costs associated with the expansions; (2) locate the new facility in close proximity to Beringer's existing St. Helena facility so that the same winemaking staff can efficiently and effectively manage both facilities; (3) locate the new facility in an area that supports the County's agricultural preservation goals; (4) reduce existing traffic and minimize future traffic along the County's highways; (5) protect wine quality and reduce truck traffic by minimizing bulk shipments of unfinished wines by providing a fermenting and barreling facility adjacent to blending operations; (6) protect wine quality and reduce truck traffic by minimizing bulk shipments of finished wines by consolidating blending and bottling processes; (7) minimize traffic impacts and operating costs by locating the distribution warehouse adjacent to the new bottling facility; and (8) provide a large enough site to support on-site wastewater treatment ponds and appropriate vineyard acreage for additional grape supply and wastewater recycling.

No Name Creek and much of the wetlands are located on the northern and northwestern portion of the site. The facility's buildings are to be clustered on the eastern portions of the site, but the project, as designed, still will result in the destruction of .461 of an acre of wetlands. As mitigation measures, Beringer plans to end cattle grazing in the area, restore No Name Creek, replant it with native vegetation and protect it by establishing 50-foot setbacks on both sides of the bank, permanently protecting approximately 20 acres as an aquatic/riparian corridor through the site. Beringer also intends to protect approximately 2.9 acres of wetlands located on the northeastern portion of the site by means of a buffer zone of 250 feet. Beringer will create an additional 1.14 acres of wetlands that also will be protected by a 250-foot buffer zone.

### Failure of EIR to Analyze Economic Feasibility of Alternatives

The EIR discusses six potential alternatives to the project. It provides no environmental analysis of three alternatives, which cannot meet Beringer's

objectives.[3] The EIR does analyze the other three alternatives: (1) a "No Project" alternative; (2) a "Wetlands Preservation" alternative; and (3) a "Reduced Development" alternative.

The No Project alternative considers the possibility either that the site will remain undeveloped or that it will be developed in some other manner consistent with the County's zoning code. The EIR finds that if the site is not developed, there will be no environmental effects resulting from development, but the creek and wetlands will continue to be degraded by the use of the land for cattle grazing. If the site is developed for other uses, the effects on the environment will be similar to those resulting from the project. In either event, it is assumed that Beringer will build its facility somewhere else with resulting environmental effects.

Under the Wetlands Preservation alternative, Beringer would build around the wetlands. The EIR finds that the effects on the environment would be similar to those occurring under the project as planned, except that the wetlands would be preserved. The EIR notes, however, that Beringer has indicated that "designing the development such that it does not include any take of critical habitat for listed species would be very difficult if not impossible, while still meeting most of the project's objectives." The Reduced Development alternative considers the possibility of reducing the size of the project by 50 percent, thereby reducing the impact of the project on the environment. This alternative would diminish most effects on the environment and could reduce significant and unavoidable impacts to wetlands by providing at least a 250-foot setback around all existing wetlands on the site and increasing the amount of acreage devoted to wetlands restoration.

In certifying the EIR and approving the use permit, the Department found that the described alternatives would be infeasible and less desirable than the project. The Department found that the No Project Alternative would not protect No Name Creek and the existing wetlands and would not meet Beringer's objectives of centralizing its operations. If the land was developed for other purposes, that development would have effects on the environment, including the wetlands, similar to those resulting from the project. It also could have a more significant negative effect on traffic than the effect that would result from the project. The Wetlands Preservation alternative would not reduce the project's impacts on air quality, traffic, visual and hydrology.

---

[3] One rejected alternative considers a site that is well located but not large enough for Beringer's purposes. In addition, there are significant wetland areas within the property. A second alternative is well located and large enough, but is not for sale. A third alternative contemplates expanding Beringer's existing facilities at another location. The EIR reports that although it might be physically possible for that expansion to occur, Beringer has rejected it as an option because it fails to meet Beringer's goal of centralizing operations to reduce the number and length of truck trips needed for those operations.

The Department also found that "[r]eorientation of the facilities would result in [fewer] vineyards due to soil constraints and placement of the wastewater ponds closer to neighboring properties on the south. This Alternative would not meet the applicant's objectives of having a site large enough and configured in a manner that supports the on-site wastewater treatment ponds and sufficient vineyard acreage for grape supply and wastewater recycling." The Reduced Development alternative would not meet Beringer's objectives, would result in increased traffic and air quality impacts at Beringer's other facilities and would not completely avoid impacts on wetlands and special wildlife species.

The Department further found that the benefits from the project would significantly outweigh its significant effects on the environment. These benefits are identified as (1) habitat restoration; (2) reduced traffic; (3) promotion of the County's planning goals of having the Airport Industrial Area Specific Plan area as an industrial center; (4) preserving and enhancing the County's economy by ensuring that Beringer, "the longest operating winery in the County," remains headquartered in the County; (5) allowing Beringer to use the railway for transportation purposes, reducing vehicle trips and air emissions and promoting the use of alternative modes of transportation, and (6) maintaining a visual perception of open space by devoting 120 acres of the property to vineyards.

In rejecting Sierra Club's appeal of the Department's decision, the Board, too, found the analyzed alternatives to be infeasible. The Board made detailed findings of fact, including a finding that the facility could not be reconfigured to avoid filling in the wetlands while at the same time preserving Beringer's "objective of reducing energy consumption, operational temperature exposure changes, truck traffic, pollution, cost, noise and safety concerns by the proposed integrated layout of its buildings along the eastern boundary of the site immediately adjacent to rail and road access, including particularly [Beringer's] objective for major reduction of the existing and future traffic from its present scattered facilities along the congested Napa-St. Helena Highway 29 corridor." The Board also found that Beringer could not comply with the requirement of maintaining 250-foot setbacks from all existing wetlands without reducing the proposed vineyard acreage by approximately 30 percent, rendering Beringer unable to recycle and dispose of facility-generated wastewater through vineyard irrigation.

### Adequacy of EIR and Power of Agency to Determine Economic Feasibility

CEQA recognizes that the policy of the state is "that public agencies should not approve projects as proposed if there are feasible alternatives *or*

feasible mitigation measures available which would substantially lessen the significant environmental effects of such projects . . . ." (§ 21002.) This policy is furthered by requiring an EIR whenever a public agency proposes to approve a project that may have a significant effect on the environment. (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 390–391 [253 Cal.Rptr. 426] (*Laurel I*), citing §§ 21100, 21151 & CEQA Guidelines, § 15002, subd. (f)(1).)[4]

"Under CEQA, the public is notified that a draft EIR is being prepared (§§ 21092 and 21092.1), and the draft EIR is evaluated in light of comments received. (Guidelines, §§ 15087 and 15088.) The lead agency then prepares a final EIR incorporating comments on the draft EIR and the agency's responses to significant environmental points raised in the review process. (Guidelines, §§ 15090 and 15132, subds. (b)–(d).) The lead agency must certify that the final EIR has been completed in compliance with CEQA and that the information in the final EIR was considered by the agency before approving the project. (Guidelines, § 15090.) Before approving the project, the agency must also find either that the project's significant environmental effects identified in the EIR have been avoided or mitigated, or that unmitigated effects are outweighed by the project's benefits. (§§ 21002, 21002.1, and 21081; Guidelines, §§ 15091–15093.)" (*Laurel I, supra,* 47 Cal.3d at p. 391, fn. omitted.) CEQA, therefore, provides that "in the event specific economic, social, or other conditions make infeasible such project alternatives or such mitigation measures, individual projects may be approved in spite of one or more significant effects thereof." (§ 21002.)

As a means of furthering the state's policy, CEQA requires EIR's "to identify the significant effects on the environment of a project, to identify alternatives to the project, and to indicate the manner in which those significant effects can be mitigated or avoided." (§ 21002.1, subd. (a).)

In the present case, the EIR identified the project's significant effects on the environment, discussed the means of mitigating those effects and found that the project's effect on the wetlands at issue could not be mitigated. The EIR also identified alternatives to the project and analyzed the impacts those alternatives would have on the environment.

Sierra Club, however, complains that the EIR did not itself analyze the economic feasibility of the identified alternatives, arguing that this failure renders the EIR inadequate. It follows, according to Sierra Club, that the Department and the Board failed to proceed in the manner required by law by

---

[4] References to Guidelines are to California's CEQA Guidelines (Cal. Code Regs., tit. 14, § 15000 et seq.)

basing their decisions on an inadequate EIR. Sierra Club essentially concedes that the Board's decision, at least, was supported by evidence presented to it, but contends that the consideration of that evidence violated CEQA and was an abuse of discretion because it was not set forth in the EIR and was not available to the public for consideration and comment prior to the Board's decision.

In *San Franciscans, supra,* 102 Cal.App.4th 656, Division Three of this court rejected an argument similar to that made by Sierra Club here. The court there found nothing in CEQA requiring an EIR to discuss the economic feasibility of a project, noting that as its very name makes evident, an EIR is an *environmental* impact report—an informational document. CEQA requires an EIR to identify project alternatives and to indicate the manner in which a project's significant effects may be mitigated or avoided, but does not mandate that the EIR itself contain an analysis of the feasibility of the various project alternatives or mitigation measures that it identifies. (*Id.* at pp. 689–690, citing §§ 21002.1, subd. (a), 21100, subd. (b)(4).)

The court pointed out, further, that it is the *public agency* that bears the responsibility for the decisions that must be made before a project can go forward, including determinations of feasibility and whether the benefits of a project outweigh the significant effects the project will have on the environment. (*San Franciscans, supra,* 102 Cal.App.4th at pp. 690–691, citing §§ 21002.1, subds. (b) & (c), 21081.) In addition, in section 21081.5, CEQA specifically provides that in making these determinations, the public agency shall base its findings *on substantial evidence in the record,* a provision reflecting an understanding that the decisionmaking entity will not limit its review to matters set forth in the EIR, but will base its decision on evidence found anywhere in the record. (*San Franciscans,* at pp. 690–691.)

Sierra Club suggests that the *San Franciscans* holding on this point is dicta, noting that the record there included a comprehensive analysis of the economic impacts and feasibility of the proposed project and of five alternatives addressed by the EIR. It remains true, however, that the economic analysis was not set forth in the EIR itself, and that the appellants in *San Franciscans* specifically contended that the EIR therefore was inadequate and the administrative agency accordingly abused its discretion in certifying the EIR. (*San Franciscans, supra,* 102 Cal.App.4th at p. 685.) The appellate court could not affirm the trial court's ruling without actually rejecting that contention. The court's analysis and holding, therefore, were not dicta.

Sierra Club contends that the holding in *San Franciscans,* and a similar holding by the Fifth District in *Association of Irritated Residents v. County of Madera* (2003) 107 Cal.App.4th 1383, 1401 [133 Cal.Rptr.2d 718], is

inconsistent with the purpose of CEQA and with the Supreme Court's decision in *Laurel I, supra,* 47 Cal.3d 376.

*Laurel I* involved a project to relocate a university's biomedical research facilities to a building in a residential area. The regents of the university apparently had considered several other sites for the facilities, but had rejected them as being infeasible. The EIR did not identify and analyze alternatives. It accepted the regents' conclusions of infeasibility at face value, reciting simply that no on-campus alternative sites had been analyzed, and that none of the sites at which the university had other facilities were of a sufficient size to accommodate the units that were to be moved. *Laurel I, supra,* 47 Cal.3d 376.

In finding the EIR to be inadequate, the court pointed out that "[w]ithout meaningful analysis of alternatives in the EIR, neither the courts nor the public can fulfill their proper roles in the CEQA process." (*Laurel I, supra,* 47 Cal.3d at p. 404.) The court also held that the alternatives and the reasons they were rejected "must be discussed in the EIR in sufficient detail to enable meaningful participation and criticism by the public. ' "[W]hatever is required to be considered in an EIR must be in that formal report; what any official might have known from other writings or oral presentations cannot supply what is lacking in the report." ' [Citations.]" (*Id.* at p. 405.)

▇ Nothing in *Laurel I* requires EIR's to analyze the economic feasibility of a particular alternative or limits the evidence an agency can consider in deciding issues of economic feasibility. The court found only that an EIR cannot abstain from the process of identifying and analyzing alternatives by accepting, at face value, an official's assertions that there are no feasible alternatives. *Laurel I,* accordingly, stands for the proposition that the EIR must identify alternatives and analyze their impacts on the environment. The agency may or may not reject those alternatives as being infeasible, but the public must be informed of their existence.[5] Here, the EIR did identify

---

[5] One point that tends to cause some confusion arises out of the need to limit the number of alternatives discussed in the EIR. For practical reasons, the EIR need set forth an in-depth analysis only of those alternatives that are at least potentially feasible. "[A]n EIR must discuss and analyze *feasible* alternatives. The local agency, therefore, must make an initial determination as to which alternatives are feasible and merit in-depth consideration, and which do not." (*Citizens of Goleta Valley v. Board of Supervisors* (1990) 52 Cal.3d 553, 569 [276 Cal.Rptr. 410, 801 P.2d 1161] (*Goleta II*).) It is not necessary that the EIR itself discuss the infeasibility of these early rejected alternatives. The court in *Goleta II* explained: "In general, an EIR should set forth the alternatives that were considered by the lead agency and rejected as infeasible during the scoping process, and the reasons underlying the agency's determination. [Citation.] However, the administrative record may be studied 'to assess the degree of discussion any particular alternative deserves, based on the alternative's feasibility and the stage in the decisionmaking process it is brought to the attention of the agency.' [Citation.] To

alternatives and analyze their impacts on the environment. *Laurel I* requires no more. (*Laurel I, supra,* 47 Cal.3d 376.)

Sierra Club cites several cases finding EIR's to be inadequate for failing to analyze a project's cumulative impacts. (E.g., *Schoen v. Department of Forestry & Fire Protection* (1997) 58 Cal.App.4th 556, 573–574 [68 Cal.Rptr.2d 343]; *Mountain Lion Coalition v. Fish and Game Com.* (1989) 214 Cal.App.3d 1043, 1052 [263 Cal.Rptr. 104].) That CEQA requires the public to be informed of the cumulative impacts of a project on the environment does not support the argument that the EIR also must provide an analysis of the economic feasibility of a project.

■ Sierra Club complains that unless the EIR contains an analysis of economic feasibility, the public will be unable to debate that issue. It finds some support for this position in the holding in *San Franciscans*, that, "In sum, in this case the EIR satisfied CEQA's mandate to identify and discuss a reasonable range of potentially feasible alternatives and compare their environmental impacts with those of the proposed Project. The administrative record then provided ample evidence and analysis of the economic feasibility of these various alternatives as compared to the Project. This evidence and analysis was available to the City, its agencies and the public to evaluate before making the ultimate decision to certify the EIR and approve the Project. CEQA does not require more than this." (*San Franciscans, supra,* 102 Cal.App.4th at p. 692.) We do not read this as holding that CEQA requires the public to be provided with a detailed analysis of a project's economic feasibility. Such a holding would be inconsistent with the court's recognition that it is the administrative agency, and not the public, that weighs the benefits of a project against its effects and bears responsibility for the decision to approve or reject the project. That the public in *San Franciscans* had access to a comprehensive analysis of economic feasibility does not mean that the public *must* have access to such a comprehensive analysis before a project may be approved.

In short, Sierra Club may be correct that the public was not part of the debate of the economic feasibility of the project, but as we read CEQA, it

be sure, agency consideration of otherwise reasonable alternatives in the administrative record cannot replace the CEQA mandated discussion of alternatives in the EIR. [Citations.] 'But where potential alternatives are not discussed in detail in the [EIR] because they are not feasible, the evidence of infeasibility need not be found within the [EIR] itself. Rather a court may look at the administrative record as a whole to see whether an alternative deserved greater attention in the [EIR].' [Citations.]" (*Ibid.*)

An EIR, however, *is* required to make an in-depth discussion of those alternatives identified as at least potentially feasible. Neither *Goleta II* nor our holding here should be construed as suggesting that a reviewing court is entitled to look outside of the EIR for discussion and analysis of alternatives identified as potentially feasible during the scoping process.

does not require the public to be a part of that debate, although it requires the public to be informed if its officials choose economic feasibility over environmental concerns in approving a project.

### Beringer's Letter

Each party submitted material to the Board just before the hearing on Sierra Club's appeal from the Department's decision. Sierra Club submitted a letter from Robert Curry, Ph.D., an expert on wetlands, stating his opinion that the information about Beringer's plans to restore wetlands was insufficient to show that restoration efforts would be successful. Beringer submitted a letter from its vice-president explaining why it would not be feasible for Beringer to configure its facility in such a way as to preserve all wetlands on the site. The letter explains, generally, that Beringer sought to consolidate its warehousing, bottling and distribution operations, allowing it to eliminate costly and inefficient multiple trucking movements of bottled and unbottled wine between the five facilities currently supporting those operations. A smaller facility would not satisfy Beringer's needs. The configuration of the buildings was dictated in part by operational concerns, including the need for access to the railway spur along the east side of the property, the need to cluster the buildings as far as possible from the restored stream and wetlands to the west and the need to plant sufficient vineyards to handle the wastewater generated by the facility. Beringer's vice-president summarized the situation: "Given the site constraints imposed by No Name Creek, the wetlands to be preserved, the utilities easement bisecting the property, the railway location, and the required access from Devlin Road, the approved project is the only place on the property to construct a facility of the size and layout that we must have to meet our fundamental business needs of operational efficiency and consolidation, which is the justification for this large and expensive project."

Sierra Club complains that the Board relied, in part, on the letter from Beringer's vice-president, arguing that even if the Board was entitled to consider evidence that was not contained in the EIR, it should not have considered this letter because such a procedure allows a developer to withhold evidence until the last minute so that the public has no opportunity to contest it, violating the spirit of CEQA.

As discussed above, we find nothing in CEQA requiring an EIR to analyze issues of economic feasibility or requiring an agency to receive public input on the question of economic feasibility. The timing of the letter, therefore, did not deprive the public of a right conferred on it by CEQA. In addition, while Beringer's letter certainly summarized the evidence and argued from it, it added little if anything to the evidence and arguments already contained in, or

subject to reasonable inference from, the administrative record. Finally, Sierra Club, which submitted its own letter to the Board, is hardly in a position to claim that Beringer acted improperly by doing the same thing.[6]

■ We conclude, therefore, that the Board did not err by considering the letters submitted by Beringer and Sierra Club.

### Evidence of Economic Infeasibility

■ CEQA does not require agencies to select the alternative course most protective of the environmental status quo. It does not and cannot guarantee that the agency's decisions will always be those that favor environmental considerations. (*Laurel I, supra,* 47 Cal.3d at p. 393; *San Franciscans, supra,* 102 Cal.App.4th at p. 695.) For purposes of CEQA review, therefore, "feasibility" does not mean that an alternative exists that could eliminate an environmental effect irrespective of difficulty or expense. It means that the alternative is "capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social, and technological factors." (§ 21061.1; Guidelines, § 15364; *Goleta II, supra,* 52 Cal.3d at p. 565; *Laurel I, supra,* 47 Cal.3d at p. 402, fn. 10.)

One of Beringer's objectives in developing the project was to consolidate its operations and reduce its costs. As to the Wetlands Preservation alternative, Beringer made a persuasive argument that the project could not be reconfigured so as to allow it to install the buildings, the ponds and the vineyards and yet maintain required setbacks from No Name Creek and all wetlands. The Reduced Development alternative, while potentially protecting

---

[6] That Sierra Club submitted its own letter also disposes of its argument that the Board violated the County's code by accepting and considering Beringer's letter. Napa County Code section 2.88.010 et seq. governs appeals to the Board from the decision to grant a permit. Section 2.88.090, subdivision A provides that the Board shall exercise its independent judgment in determining whether the decision appealed was correct. Subdivision A further provides that the board's decision shall be based on a review of the record and such additional evidence as may be presented which could not have been presented at the time the decision appealed from was made. Subdivision B qualifies that provision, providing upon request at the hearing by the appellant or any interested party, and a showing of good cause, the board may permit additional evidence to be presented which could have been presented at the time the decision appealed from was made but was not or may order that the matter be heard de novo.

Sierra Club, characterizing Beringer's letter as "additional evidence," complains that Beringer made no showing of good cause for failing to produce that evidence prior to the Department's decision. We view Beringer's letter more as argument than as evidence, although it refers to and summarizes evidence. In any event, Napa County Code section 2.88.090, subdivision A, which also permits the Board to order that the matter be heard de novo, is broad enough to allow the Board to consider any and all evidence it believes to be relevant to the questions before it. Moreover, again, Sierra Club waived any procedural defect when it asked the Board to consider Dr. Curry's letter.

the wetlands, would not achieve the objective of consolidating Beringer's operations to minimize costs and reduce highway usage. On this, and other evidence, the Department, and later the Board, was entitled to find these alternatives to be infeasible.

Sierra Club asserts that in analyzing the Reduced Development alternative, the EIR noted that the alternative "may be feasible." In context, this statement was nothing more than an explanation that the drafters had not determined that the alternative clearly was infeasible, recognizing that the ultimate decision of economic feasibility rested not with the drafters of the EIR, but with the agency deciding whether to allow the project to go forward notwithstanding its effects on the environment. At the most, the statement alerted the reviewing agencies that the Reduced Development alternative might be economically feasible; it was not evidence that this alternative was in fact feasible.

Sierra Club also complains that the findings that the alternatives were infeasible were conclusory. As discussed earlier, the findings of feasibility must be supported by the record. (§ 21081.5.) Although the record certainly could have included more evidence on the point, there is evidence, even without the Beringer letter, from which the Department and the Board were entitled to find that none of the alternatives were feasible. Finally, the Board's findings were supported by some 20 pages of findings and analysis, and cannot reasonably be characterized as conclusory.

 It is of no matter that the evidence of economic infeasibility here was far less detailed than the evidence in *San Franciscans, supra*, 102 Cal.App.4th 656. The question is simply whether the agency's finding was supported by substantial evidence. Moreover, as was true of the appellants in *San Franciscans*, Sierra Club neither introduced, nor can it cite to, evidence suggesting that some alternative was in fact fully feasible. It follows that there is uncontradicted evidence that the project is the only feasible means of accomplishing Beringer's objectives.

### Failure to Analyze Alternatives

 Sierra Club also emphasizes that Beringer's letter asserted that Beringer had "determined that if the facility, as sized and sited, was not approved by Napa County, it would have to locate such a facility outside of Napa County, since the facility, as designed, is essential to Beringer's continued operations." Sierra Club claims that this assertion demonstrates that locating the facility outside of the county was a feasible alternative. We do not read this statement as a declaration that Beringer had found some other site for the project. Beringer is saying no more than that there is no feasible alternative

within Napa County—a point also made by the EIR—and that it would be forced to look elsewhere if the Board refused to allow the project as planned to go forward. An EIR need not consider an alternative whose effect cannot reasonably be ascertained and whose implementation is remote and speculative. (Guidelines, § 15126.6, subd. (f)(3).)

■ Sierra Club complains that there is no analysis of the feasibility of having Beringer dispose of some or all of the project wastewater through the sewer system, thereby eliminating the need for the ponds and some or all of the vineyards and potentially protecting at least some of the threatened wetlands. This complaint assumes that Beringer has no objective other than consolidating operations. Beringer also had the specific objective of putting vineyards on the site and irrigating them with wastewater resulting from its operations. The EIR was not required to analyze the effects of a project that Beringer did not propose, or to analyze the effects of an alternative that would not feasibly attain most of the basic objectives of the project. (Guidelines, § 15126.6, subds. (a) & (f).)[7]

### Consistency with Specific Plan

A project is consistent with a county's general plan (and any specific plan adopted to further the objectives of the general plan) " ' "if, considering all its aspects, it will further the objectives and policies of the general plan and not obstruct their attainment." ' [Citation.] A given project need not be in perfect conformity with each and every general plan policy. [Citation.] To be consistent, a [project] must be 'compatible with' the objectives, policies, general land uses and programs specified in the general plan. [Citation.]" (*Families Unafraid to Uphold Rural Etc. County v. Board of Supervisors* (1998) 62 Cal.App.4th 1332, 1336 [74 Cal.Rptr.2d 1] (*FUTURE*), quoting from *Corona-Norco Unified School Dist. v. City of Corona* (1993) 17 Cal.App.4th 985, 994 [21 Cal.Rptr.2d 803].)

In reviewing an agency's decision for consistency with its own plan, "we accord great deference to the agency's determination. This is because the body which adopted the general plan policies in its legislative capacity has unique competence to interpret those polices when applying them in its adjudicatory capacity. [Citation.] Because policies in a general plan reflect a

---

[7] Beringer also produced evidence that it was more cost effective to recycle the wastewater than to pretreat the wastewater generated at its facility, dispose of it through the sewer system and purchase water to irrigate and protect the proposed vineyard. Beringer would have to pay a one-time fee of approximately $6 million to hook into the system, and would be charged for the continued use of the system. In addition, as Beringer would be required to pretreat any water disposed of through the sewer system, it still would need treatment ponds and holding ponds.

range of competing interests, the governmental agency must be allowed to weigh and balance the plan's policies when applying them, and it has broad discretion to construe its policies in light of the plan's purposes. [Citations.] A reviewing court's role 'is simply to decide whether the city officials considered the applicable policies and the extent to which the proposed project conforms with those policies.' [Citation.]" (*Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 142 [104 Cal.Rptr.2d 326].)

Here, the county designated the area at issue for "light industrial and office," specifically recognizing that "cooperage, bottling plants, and wine warehousing" are activities appropriate to the area. The Department and the Board found that the project was perfectly consistent with nearly every goal or policy in the Specific Plan. It is true that, as Sierra Club points out, the Specific Plan also provides that "[a]ll wetland and stream habitat shall be protected in their natural state, unless this is proved to be infeasible. Mitigation compensation shall be provided on a replacement basis for all such habitats impacted." Sierra Club argues that the destruction of the wetlands therefore renders the project fatally inconsistent with the Specific Plan.

█ Sierra Club's reading of the Specific Plan is too narrow. The Specific Plan allows impacts on habitat upon a finding that it is infeasible to preserve them in their natural state. The Department and the Board found that it was not feasible to protect the wetlands at issue. On this finding, the approval of the project was perfectly consistent with the Specific Plan.

Sierra Club's argument, again, is with the County's finding that it was infeasible to protect the wetlands. They interpret the term "infeasible" as meaning "impossible," suggesting that the Specific Plan requires preservation of the wetlands if it can be done, irrespective of difficulty or cost, and irrespective of whether the additional difficulty or cost will prevent the project from going forward.

We find no basis in the wording of the Specific Plan itself, or in the law, justifying such a narrow reading of the term "feasible." First, Sierra Club's interpretation ignores the second part of the stated policy. If the term "feasible" means "possible," few projects would go forward that impact wetlands because it nearly always would be possible to protect the wetlands. By providing for mitigation compensation for impacted habitats, however, the plan clearly contemplates that development will occur even though it will have effects on streams and wetlands.

█ Second, as noted above, general and specific plans attempt to balance a range of competing interests. It follows that it is nearly, if not absolutely,

impossible for a project to be in perfect conformity with each and every policy set forth in the applicable plan. An agency, therefore, has the discretion to approve a plan even though the plan is not consistent with all of a specific plan's policies. It is enough that the proposed project will be compatible with the objectives, policies, general land uses and programs specified in the applicable plan. (*Sequoyah Hills Homeowners Assn. v. City of Oakland* (1993) 23 Cal. App.4th 704, 719–720 [29 Cal.Rptr.2d 182]; and see *San Franciscans, supra,* 102 Cal.App.4th at p. 678, applying the same principle to a project to demolish an historically significant building.) In *Defend the Bay v. City of Irvine* (2004) 119 Cal.App.4th 1261 [15 Cal.Rptr.3d 176], for example, the court found no inconsistency between a general plan's policy of striving to improve a city's jobs-to-housing relationship and a project creating more jobs than housing. The court found that it was enough that the public agency weighed pros and cons to achieve an acceptable mix. (*Id.* at pp. 1268–1269.) The Specific Plan presumably was drafted with these principles in mind, and used the term "feasible" to allow the County's agencies a measure of flexibility in their decisionmaking.

Finally, as discussed earlier, under CEQA, "feasibility" means "capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social, and technological factors." (§ 21061.1; Guidelines, § 15364; *Goleta II, supra,* 52 Cal.3d at p. 565; *Laurel I, supra,* 47 Cal.3d at p. 402, fn. 10.) There simply is no reason to impose some other interpretation of the term in the Specific Plan.

Sierra Club cites *FUTURE, supra,* 62 Cal.App.4th 1332. The general plan there specified without exception that the designation "low density residential" would be restricted to certain areas. The agency, however, approved a project proposing to develop "low density residential" in another area, thereby approving a project that directly conflicted with a mandatory policy set forth in the plan. It followed that the agency's implied finding of consistency was not supported by substantial evidence. Here, the plan specifically allows development that will impact wetlands when it is not feasible to protect those wetlands, allowing the agency to decide whether protection of the wetlands in a project is or is not feasible. The Department and the Board found that protection of the wetlands was not feasible. Substantial evidence supports that finding. *FUTURE,* therefore, is inapposite.

### Conclusion

As Sierra Club contends, the EIR does not itself analyze the economic feasibility of identified alternatives to the project. We find that CEQA does not require such an analysis. We find that the Department was entitled to consider matters contained in the entire administrative record in determining

that identified alternatives are not economically feasible or that the benefits from the project, including the positive effects it will have on the environment, will outweigh its negative effects. In making its own independent findings and decision on those issues, the Board, too, was entitled to consider the entire record, including letters submitted after the Department's decision. The findings that other alternatives were not economically feasible are supported by the record. The EIR was not inadequate for failing to identify and analyze alternatives that would not meet Beringer's objectives, including the objective of planting a vineyard and disposing of wastewater generated by the facility by using it to irrigate and protect the vineyard. The project is consistent with the Specific Plan.

The judgment is affirmed. Defendants are awarded their appellate costs.

Swager, J., and Margulies, J., concurred.

A petition for a rehearing was denied September 8, 2004, and appellant's petition for review by the Supreme Court was denied December 1, 2004.