Filed 12/3/19; Certified for Publication 12/13/19 (order attached)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| LARK HOLDEN, | D074474 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-2017-00018417-CU-TT-CTL) |
| CITY OF SAN DIEGO et al., | |
| Defendants and Respondents; | |
| IDEA ENTERPRISE, LP, | |
| Real Party in Interest and Respondent. | |

APPEAL from a judgment of the Superior Court of San Diego County, Gregory W. Pollack, Judge.  Affirmed.

Law Offices of Felix Tinkov and Felix M. Tinkov for Plaintiff and Appellant.

Mara W. Elliott, City Attorney, Glenn T. Spitzer and Tyler Louis Krentz, Deputy City Attorneys for Defendants and Respondents.

Dillon Miller & Ahuja, Timothy P. Dillon and Sunjina K. Ahuja for Real Party In Interest and Respondent.

Plaintiffs Lark Holden and James Stansell[1] appeal a judgment denying their petition for writ of mandate challenging decisions by the City of San Diego and City Council for the City of San Diego (collectively City) to grant a California Environmental Quality Act (CEQA; Pub. Resources Code, § 21000 et seq.)[2] exemption for a residential development project proposed by IDEA Enterprise, LP (IDEA) in the North Park area of City and to approve the project. On appeal, Holden contends that: (1) City abused its discretion by granting a CEQA exemption for the project; and (2) City erred by approving the project with a residential density less than that required by its general plan (General Plan). As we explain *post*, the trial court did not err in denying the petition.

FACTUAL AND PROCEDURAL BACKGROUND

In 2014, IDEA submitted an application to City for the demolition of two existing single-family houses on adjacent parcels and construction of seven detached residential condominium units on the 0.517-acre aggregate site on Indiana Street in City's North Park community (Project). The Project's site is located on the western hillside of a canyon with a 35- to 41-degree down slope; the site is considered to be environmentally sensitive land. The Project would cover approximately 42 percent of the site.

---

[1]    On May 3, 2019, appellants' counsel informed this court that Stansell had passed away. On June 11, 2019, we issued an order dismissing Stansell's appeal. Accordingly, Holden is the sole appellant in this appeal.

[2]    All statutory references are to the Public Resources Code unless otherwise specified.

In 2015, City's planning staff initially informed IDEA that the Project did not comply with the minimum density required for development of the site under City's General Plan and its Greater North Park Community Plan (Community Plan). Specifically, the planning staff told IDEA that a minimum of 16 residential units would be required under Policy LU-C.4 of the General Plan and the housing element of the Community Plan. However, in late 2015, City's staff informed IDEA that the Project could be approved with seven residential units, citing the site's environmental sensitivity, which made a reduced density of seven residential units appropriate.

In November 2015, the North Park Community Planning Group voted to recommend approval of the Project without conditions. In 2016, a preliminary review by City's staff concluded that the Project was categorically exempt from CEQA requirements because it qualified as an infill development project pursuant to section 15332 of the California Code of Regulations, title 14, division 6, chapter 3 (Guidelines). In order for a project to qualify as an infill development project under the exemption set forth in section 15332 of the Guidelines, the project must, inter alia, be "consistent with the applicable general plan designation and all applicable general plan policies . . . ." (*Id.*, § 15332, subd. (a).) City proceeded to issue an environmental determination that the Project is categorically exempt from CEQA pursuant to section 15332 of the Guidelines. The City Council denied an appeal challenging that determination. On January 19, 2017, City's planning commission voted to recommend that the City Council approve the Project's tentative map and site development permit. On April 18, the City Council unanimously voted to approve the tentative map and site development permit for the

3

Project.  City thereafter filed a notice of exemption declaring that the Project was

categorically exempt from CEQA pursuant to section 15332 of the Guidelines.

In May 2017, Holden and Stansell filed a petition for writ of mandate challenging

both City's determination that the Project is exempt from CEQA and its approval of the

Project.  The trial court denied the petition, stating in part:

> "The first issue is whether substantial evidence supports the City's
> determination to approve the project pursuant to CEQA Guidelines
> section 15332.  [¶]  Petitioners contend that . . . City avoided its duty
> to perform an environmental review despite the [P]roject's failure to
> meet the density minimum required under [General Plan] Policy LU-
> C.4.  It reads:  'Ensure efficient use of remaining land available for
> residential development and redevelopment by requiring that new
> development meet the density minimums of applicable plan
> designations.'  (AR 56:2311.)  They state that [IDEA] was required
> to develop multi-family housing within a medium-high density of
> 30-44 dwelling units per acre.  (AR 50:2033.)  In short, Petitioners
> argue for the application of a rigid minimum density requirement.
> However, [General Plan Policy] LU-C.2 specifically directs the City
> to '[r]ely on community plans for site-specific land use and density
> designations and recommendations.'  (AR 56:2310.)  Furthermore, a
> note on Figure 6 of the Plan Elements sections of the . . . Community
> Plan states that '[t]he residential density recommendations may be
> subject to modification during implementation of this plan.'  (AR
> 45:1960.)  Also, the Implementation Program within that section
> provides '[t]he achievability of the recommended densities may be
> predicated upon the design standards, development regulations and
> other regulations of the implementing legislation.'  In sum, as the
> City's counsel pointed out at oral argument, a certain amount of
> flexibility was contemplated by the City and built into the process.
>
> "The record indicates that the City balanced the density requirements
> against the topography of the land and its accompanying restrictions
> to come up with a plan that generated the maximum possible density
> allowable under the circumstances.  In other words, the project
> minimized the impacts to the environmentally sensitive lands
> through the planning of several smaller scaled detached dwelling
> units sited across the eastern frontage of the property that are
> designed on stilts to elevate the detached structures to natural land-

4

form. (AR 4:14-16, 8:58, 41:1640-1644.) Thus, the Court concludes that substantial evidence exists to support the City's decision to rely on [Guidelines] section 15332 for infill development.

"The second issue is whether a [G]eneral [P]lan amendment was required. Given the fact that the Community Plan, as noted above, allows for the modification of the recommended densities based upon implementation and consideration of applicable regulations, [the] Court concludes that a [G]eneral [P]lan amendment pursuant to [General Plan Policy] LU-D.1 was not necessary in this case."

On April 27, 2018, the court entered an amended judgment against Holden and Stansell. Holden and Stansell timely filed a notice of appeal challenging the amended judgment.

DISCUSSION

I

*CEQA and Standards of Review*

"CEQA and its implementing regulations 'embody California's strong public policy of protecting the environment.' " (*Bottini v. City of San Diego* (2018) 27 Cal.App.5th 281, 291 (*Bottini*).) "CEQA establishes a three-tier environmental review process. The first step is jurisdictional and requires a public agency to determine whether a proposed activity is a 'project.' . . . If a proposed activity is a project, the agency proceeds to the second step of the CEQA process. [¶] At the second step, the agency must 'decide whether the project is exempt from the CEQA review process under either a statutory exemption [citation] or a categorical exemption set forth in the . . . Guidelines [citations].' . . . [¶] Unlike statutory exceptions, categorical exemptions are subject to exceptions. . . . [¶] If a project is categorically exempt and does not fall within an

5

exception, ' "it is not subject to CEQA requirements and 'may be implemented without any CEQA compliance whatsoever.' " ' " (*Id*. at pp. 291-292.) "[I]f a project is not exempt, the agency must then 'decide whether the project may have a significant environmental effect.' " (*Id*. at p. 292.) "[I]f the project may have a significant effect on the environment, the agency must proceed to the third step of the process and prepare an environmental impact report (EIR)." (*Ibid*.)

On an appeal challenging a trial court's denial of a petition for a writ of mandate in a CEQA case, our task is the same as the trial court's. (*Banker's Hill, Hillcrest, Park West Community Preservation Group v. City of San Diego* (2006) 139 Cal.App.4th 249, 257 (*Banker's Hill*).) We conduct our review of the agency's action independently of the trial court's findings. (*Quail Botanical Gardens Foundation, Inc. v. City of Encinitas* (1994) 29 Cal.App.4th 1597, 1602, fn. 3.) Accordingly, in this appeal we review City's decision and not the trial court's. (*Banker's Hill*, at p. 257.)

A public agency's "determination that [a particular] project [is] exempt from compliance with CEQA requirements . . . is subject to judicial review under the abuse of discretion standard in . . . section 21168.5. [Citations.] . . . Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence. [Citation.] [¶] Where the issue turns only on an interpretation of the language of the Guidelines or the scope of a particular CEQA exemption, this presents 'a question of law, subject to de novo review by this court.' [Citations.] Our task is 'to determine whether, as a matter of law, the [project] met the definition of a categorically exempt project.' [Citation.]

6

Thus[,] as to the question [of law] whether the activity comes within the categorical class of exemptions, 'we apply a de novo standard of review, not a substantial evidence standard.' " (*Save Our Carmel River v. Monterey Peninsula Water Management Dist.* (2006) 141 Cal.App.4th 677, 693-694 (*Save Our Carmel River*).)

In contrast, where a public agency makes a factual determination that a project falls within a statutory or categorical exemption, we apply the substantial evidence standard in reviewing the agency's finding. (*Banker's Hill*, *supra*, 139 Cal.App.4th at p. 267; *CREED-21 v. City of San Diego* (2015) 234 Cal.App.4th 488, 510-511 (*CREED-21*); *San Lorenzo Valley Community Advocates for Responsible Education v. San Lorenzo Valley Unified School Dist.* (2006) 139 Cal.App.4th 1356, 1382; *Fairbank v. City of Mill Valley* (1999) 75 Cal.App.4th 1243, 1251.) In particular, in this case we apply the substantial evidence standard of review to City's factual finding that the Project is consistent with the General Plan and the Community Plan. (Cf. *Banker's Hill*, at pp. 267-268.)

In applying the substantial evidence standard, we review the administrative record of the public agency's decision (e.g., agency's determination that a CEQA exemption applies to a project) for substantial evidence to support that decision. (*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 570-571 (*Western States*); *CREED-21*, *supra*, 234 Cal.App.4th at p. 510; *Great Oaks Water Co. v. Santa Clara Valley Water Dist.* (2009) 170 Cal.App.4th 956, 968 (*Great Oaks*).) Substantial evidence is evidence of ponderable legal significance that is reasonable in nature, credible, and of solid value. (*Banker's Hill*, *supra*, 139 Cal.App.4th at p. 261, fn. 10.) In applying the

7

substantial evidence standard of review, all conflicts in the evidence are resolved in favor of the prevailing party and all legitimate and reasonable inferences are made to support the agency's decision. (*Western States*, at p. 571; *Great Oaks*, at p. 968.) When two or more inferences reasonably can be deduced from the evidence, we cannot substitute our deductions for those of the agency. (*Western States*, at pp. 571-572.)

II

*City's Finding That the Project Is Exempt from CEQA*

Holden contends that City erred by finding that the Project is exempt from CEQA under the categorical exemption for infill development. In particular, he argues that the Project provides for less residential density than is required by the General Plan and therefore, does not satisfy the requirements for an infill development exemption.

A

City concluded that the Project is exempt from CEQA because it satisfies the requirements for a categorical exemption for infill development under Guidelines section 15332. Guidelines section 15332 states that infill development is exempt from CEQA if it meets the following conditions:

> "(a) *The project is consistent with the applicable general plan designation and all applicable general plan policies as well as with applicable zoning designation and regulations*.
>
> "(b) The proposed development occurs within city limits on a project site of no more than five acres substantially surrounded by urban uses.
>
> "(c) The project site has no value as habitat for endangered, rare or threatened species.

8

"(d) Approval of the project would not result in any significant effects relating to traffic, noise, air quality, or water quality.

"(e) The site can be adequately served by all required utilities and public services."  (Italics added.)

Projects that are exempt under Guidelines section 15332 are referred to as "Class 32" infill development projects.  (Guidelines, § 15332.)

As stated *ante*, Guidelines section 15332(a) requires, inter alia, that the project be "consistent with the applicable general plan designation and all applicable general plan policies . . . ."  "General plans ordinarily do not state specific mandates or prohibitions. Rather, they state 'policies,' and set forth 'goals.' "  (*Napa Citizens for Honest Government v. Napa County Bd. of Supervisors* (2001) 91 Cal.App.4th 342, 378 (*Napa Citizens*).)  A project is consistent with a general plan if it will further the objectives and policies of the general plan and not obstruct their attainment.  (*Corona-Norco Unified School Dist. v. City of Corona* (1993) 17 Cal.App.4th 985, 994.)  To be consistent with a general plan, a project must be compatible with the objectives, policies, general land uses, and programs specified in the general plan.  (*Ibid*.; Gov. Code, § 66473.5.)  "The question is not whether there is a direct conflict between some mandatory provision of a general plan and some aspect of a project, but whether the project is compatible with, and does not frustrate, the general plan's goals and policies."  (*Napa Citizens*, at p. 378.)  The requirement that a project be consistent with a general plan does not require the project to rigidly conform to the general plan.  (*San Franciscans Upholding the Downtown Plan v. City and County of San Francisco* (2002) 102 Cal.App.4th 656, 678 (*San Franciscans Upholding*).)  "State law does not require perfect conformity between a proposed project

9

and the applicable general plan . . . ."  (*Friends of Lagoon Valley v. City of Vacaville* (2007) 154 Cal.App.4th 807, 817.)  "[G]eneral and specific plans attempt to balance a range of competing interests.  It follows that it is nearly, if not absolutely, impossible for a project to be in perfect conformity with each and every policy set forth in the applicable plan. . . .  It is enough that the proposed project will be *compatible with* the objectives, policies, general land uses and programs specified in the applicable plan."  (*Sierra Club v. County of Napa* (2004) 121 Cal.App.4th 1490, 1510-1511 (*Sierra Club*), italics added.)

We give great deference to a public agency's finding of consistency with its own general plan.  (*San Franciscans Upholding*, *supra*, 102 Cal.App.4th at pp. 677-678.)  One court explained the reasoning for such deference, stating:  "When we review an agency's decision for consistency with its own general plan, we accord great deference to the agency's determination.  This is because the body which adopted the general plan policies in its legislative capacity has unique competence to interpret those policies when applying them in its adjudicatory capacity.  [Citation.]  Because policies in a general plan reflect a range of competing interests, the governmental agency must be allowed to weigh and balance the plan's policies when applying them, and it has broad discretion to construe its policies in light of the plan's purposes.  [Citations.]  A reviewing court's role 'is simply to decide whether the city officials considered the applicable policies and the extent to which the proposed project conforms with those policies.' "  (*Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 142 (*Save Our Peninsula Committee*).)  "A city's findings that the project is consistent with its general plan can be reversed only if it is based on evidence from which no

10

reasonable person could have reached the same conclusion." (*A Local & Regional Monitor v. City of Los Angeles* (1993) 16 Cal.App.4th 630, 648 (*A Local & Regional Monitor*).) Further, the party challenging a public agency's determination of general plan consistency has the burden to show why that determination is unreasonable. (*Pfeiffer v. City of Sunnyvale City Council* (2011) 200 Cal.App.4th 1552, 1563.)

B

In arguing that the Project is inconsistent with the General Plan, Holden primarily relies on Policy LU-C.4 of the General Plan, which states that one of the General Plan's policies for community planning is to "[e]nsure efficient use of remaining land available for residential development and redevelopment by requiring that new development meet the density minimums of applicable plan designations." Table LU-C.4 of the General Plan recommends that residential areas designated as "Medium High" provide for multi-family housing with a density range of 30- to 44-dwelling units per acre. As IDEA and City note, Policy LU-C.1 of the General Plan states that another of the General Plan's policies is to "[e]stablish each community plan as an essential and integral component of the City's General Plan with clear implementation recommendations" and provides, in particular, that City should "[r]ely on community plans for site-specific land use and density designations and recommendations." Thus, the density designations and recommendations set forth in the Community Plan for site-specific land use are deemed to be an integral component of the General Plan and are therefore effectively integrated with and incorporated into the General Plan.

11

Applying the density designations and recommendations set forth in the Community Plan's housing element to the Project, the City Council found, and the parties agree, that the Project falls within an area designated by the Community Plan for recommended "medium-high" residential densities of 30- to 45-dwelling units per acre. The Community Plan's residential density recommendations in its housing element section includes Figure 6, which is a residential density map that illustrates recommended residential densities for specific areas within the North Park community, and Table 2, which designates in table form the recommended residential densities for those specific areas.  Based on the City Council's findings, the Project appears to fall geographically within area 16 of Figure 6, an area for which the Community Plan recommends a medium-high residential density of 30- to 45-dwelling units per acre.  Therefore, as the City Council found, the Project, consisting of about 0.52 of an acre, ordinarily would be required to have 16- to 23-dwelling units pursuant to the General Plan's Policy LU-C.4, which adopts "the density minimums of applicable plan designations" (e.g., the residential designations and densities recommended in Table 2 and Figure 6 of the Community Plan).

Although the Project ordinarily would be required by the General Plan and the Community Plan to have 16- to 23-dwelling units, the City Council further found: "[D]ue to the existing site development constraints with a heavily vegetated urban canyon and environmentally sensitive steep hillsides on the premises, a lower density of seven units at this site represents a more sensitive approach to this unique area and [General Plan] Policy LU-C.4 can be supported for the proposed density related to canyon and

12

hillside preservation in the community."  In support of that finding, City cited to a note on Figure 6 of the Community Plan, which states:  "*The residential density recommendations may be subject to modification* during implementation of this plan." (Italics added.)  Further, the implementation program subsection of the Community Plan's housing element states in relevant part:  "Refinements and *modifications to the* boundaries and *recommended densities* for the various residential areas *may be incorporated into the implementing legislation.  In addition, the achievability of the recommended densities may be [predicated] upon the design standards, development regulations and other regulations of the implementing legislation*."  (Italics added.)

City's implementing legislation includes its regulations for development of environmentally sensitive lands, which are found at San Diego Municipal Code (Mun. Code) section 143.0101 et seq.  City's environmentally sensitive lands regulations apply to all proposed development when environmentally sensitive lands are present on the premises.  (Mun. Code, § 143.0110.)  Environmentally sensitive lands include premises that contain steep hillsides.  (Mun. Code, § 143.0110(a)(2).)  Section 143.0142 of the Municipal Code provides that "[*d*]*evelopment* that proposes *encroachment* into *steep hillsides* . . . is subject to the following regulations and the Steep Hillside Guidelines in the Land Development Manual."  Those steep hillside regulations include a limitation on the allowable development areas and, in particular, provide that, outside of certain protected areas, "[*s*]*teep hillsides* shall be preserved in their natural state, except that

13

*development* is permitted in *steep hillsides* if necessary to achieve a maximum development area of 25 percent of the premises."[3]  (Mun. Code, § 143.0142(a)(2).)

In approving the Project and determining that it is exempt from CEQA, the City Council found that the Project is consistent with the policies, goals, and objectives of the General Plan.  In particular, it found that although Policy LU-C.4 of the General Plan requires new development to meet the density requirements of the Community Plan, which ordinarily would require 16- to 23-dwelling units on the Project's 0.52-acre site, "due to the existing site development constraints with a heavily vegetated urban canyon and environmentally sensitive steep hillsides on the premises, a lower density of seven units at this site represents a more sensitive approach to this unique area and [General Plan] Policy LU-C.4 can be supported for the proposed density related to canyon and hillside preservation in the community."  The City Council found that "the density and scale of the [Project] strikes a balance between the permissible Medium-High Residential development and the existing dense vegetation of the canyon south-east of the site."  It stated:  "The Project site's topography is comprised of nearly 80% of steep hillside slopes

---

[3]    City's steep hillside regulations further provide that "[a]ll *development* occurring in *steep hillsides* shall comply with the design standards identified in the Steep Hillside Guidelines in the Land Development Manual for the type of *development* proposed." (Mun. Code, § 143.0142(b).)  Because those Steep Hillside Guidelines are not part of the record on appeal, we need not, and do not, discuss their applicability to the Project or their relevance to the City Council's determination that the Project is exempt from CEQA.

14

with grades ranging from 253.5 feet to 300.2 feet.  This change in topography has created the development design for the units to establish the building massing by vertically stacking three floor levels (two above street level and one below basement) with minimal setback from the street and elevated on stilts to the rear on each unit.  The development layout of separated, low-lying buildings, benefits the surrounding neighborhood by minimizing the impact to the natural topography of the site and maximizing on-site open spaces as well as maintaining several significant trees on the site.  Due to these constraints, the proposed design provides a uniquely different product of seven detached dwellings, elevated above the terrain and cushioned within the existing vegetation of the existing urban canyon."

The City Council further found:  "The steep hillside terrain makes it challenging to achieve the minimum dwelling unit density permissible under the . . . Community Plan without extensive steep hillside grading and clearance of the existing vegetation.  The Project with the proposed lower density of seven detached dwelling units and hillside stilt structure construction is a suitable balance of providing an urban infill on environmentally sensitive steep hillsides and the retention and regeneration of the highly vegetated canyon.  Therefore, the site is physically suitable for the type and density of development."  The City Council expressly found that the Project is consistent with the Community Plan and City's environmental regulations.  It stated:  "The [Project's] creation of seven new dwellings, where there existed two units, would assist the housing needs of the North Park area community."

15

The City Council also specifically found that the Project conformed to City's steep hillside regulations, stating:

> "The site is currently developed with two single-family residential units above an urban canyon's steep hillside with a 35-41% down slope gradient, east to southeast. The entire site (100%) is considered steep hillsides and the existing development encompasses 22% of the site. The Project proposes to demolish the existing units and construct the new multi-family detached units which will encompass 42% of the site. [¶] Although the development exceeds the 25% threshold for encroachment into steep hillsides, the Project does not conflict with any other development regulations for the site. Consistent with the Steep Hillsides Guidelines standards for multiple dwelling unit development, the proposed Project's design will respect existing natural landforms, minimize impacts to steep hillsides, the graded development pad areas will blend with the existing topography, the site improvements are designed and located to minimize impacts to the steep hillside, [and] the design and placement of the structures will respect the steep hillside character . . . ."

The City Council also found that the Project's proposed use and design met the purpose and intent of the Community Plan and would not adversely affect the Community Plan or the General Plan. Accordingly, the City Council approved the Project.

The extensive findings by the City Council, as discussed *ante*, show that it considered the General Plan, the Community Plan, and City's steep hillside development regulations in approving the Project and, in so doing, expressly balanced the competing interests of the General Plan and the Community Plan's policies and objectives of providing multifamily housing with a medium-high density at the Project's site against the purpose of City's steep hillside regulations to protect such environmentally sensitive lands. Based on our review of the record, we conclude that City acted reasonably and did not abuse its discretion by balancing those competing, and necessarily (in this case)

16

conflicting, policies and regulations and finding that the Project's density of seven dwelling units conformed to the General Plan, the Community Plan, and City's steep hillside development regulations. (*Save Our Peninsula Committee*, *supra*, 87 Cal.App.4th at p. 142; *A Local & Regional Monitor*, *supra*, 16 Cal.App.4th at p. 648.) In particular, City reasonably could find that because of the Project's steep hillside topography, it would be impractical to construct 16- to 23-dwelling units on the Project's site and that such density would be inconsistent with its steep hillside development regulations that apply to the site. Therefore, City could reasonably conclude that the construction of seven dwelling units, as proposed by IDEA, is consistent with the General Plan, the Community Plan, and City's steep hillside regulations. Alternatively stated, City reasonably concluded, albeit implicitly, that the Project is compatible with the objectives, policies, general land uses, and programs specified in the General Plan and the Community Plan. (*Sierra Club*, *supra*, 121 Cal.App.4th at p. 1511.)

As discussed *ante*, we defer to City's finding of consistency with the General Plan and the Community Plan. City adopted both plans in its legislative capacity and therefore, has unique competence to interpret the policies set forth in those policies when applying them in its adjudicatory capacity. (*Save Our Peninsula Committee*, *supra*, 87 Cal.App.4th at p. 142.) Accordingly, we conclude that there is substantial evidence to support City's finding that the Project is consistent with the General Plan and the Community Plan. (Cf. *Banker's Hill*, *supra*, 139 Cal.App.4th at p. 267.) Because there is substantial evidence to support City's finding that the Project is consistent with the General Plan and the Community Plan, it follows that there is also substantial evidence to

17

support its finding that the Project is exempt from CEQA as infill development pursuant to Guidelines section 15332 and, in particular, its implicit finding that "[t]he project is consistent with the applicable general plan designation and all general plan policies" within the meaning of Guidelines section 15332, subdivision (a). We therefore conclude that City did not abuse its discretion by finding the Project is exempt from CEQA.[4] (§ 21168.5; *Save Our Carmel River*, *supra*, 141 Cal.App.4th at p. 693 [abuse of discretion standard applies in reviewing agency's determination that project is exempt from CEQA].)

C

Contrary to Holden's assertion, the General Plan's density designations and recommendations are not rigid and can be adjusted or modified for certain areas or sites as provided in community plans. As stated *ante*, Policy LU-C.1 of the General Plan makes "each community plan [e.g., the Community Plan] . . . an essential and integral component of the City's General Plan" and provides, in particular, that City should "[r]ely on community plans for site-specific land use and density designations and recommendations." As a result of that language, the Community Plan's density designations and recommendations for site-specific land use are deemed to be an integral

---

[4]     To the extent that the issues discussed *ante* involve pure questions of law, as Holden asserts, our independent interpretation of the General Plan, the Community Plan, City's environmentally sensitive lands regulations, and other relevant laws and regulations would not change our conclusions and disposition of this appeal.

component of the General Plan and are therefore effectively integrated with and incorporated into the General Plan. Because the provisions of the General Plan and the Community Plan must be construed together, we reject Holden's claim that the Community Plan's provisions cannot vary from, or modify, the density designations and recommendations set forth in the General Plan. We likewise reject Holden's related assertion that the General Plan must be amended before City may allow development of a site with a density less than that recommended in the General Plan.[5] Rather, if a proposed project is consistent with the General Plan, the Community Plan, and City's development regulations, the density *recommended* by the General Plan for certain designated areas (e.g., medium-high residential areas) need not be rigidly followed.[6]

---

[5]    Although, as Holden notes, Policy LU-D.1 of the General Plan "[r]equire[s] a General Plan and community plan amendment for proposals that involve: a change in community plan adopted land use or density/intensity range," where a proposed project, such as the Project, is consistent with the General Plan and the Community Plan, no amendment is required to the density recommendations set forth in those plans.

[6]    Accordingly, Holden's citations to Municipal Code sections 122.0105(a) and 122.0102 do not persuade us to reach a contrary conclusion. Municipal Code section 122.0105(a) provides: "*Land use plans* and *land use plan* amendments shall be initiated in accordance with the General Plan Land Use Elements." (Mun. Code, § 122.0105(a).) Because we construe the General Plan and the Community Plan together as an integrated document, we do not look solely to the General Plan's density designations and recommendations for the Project's site. Similarly, Municipal Code section 122.0102 provides: "Any planning or *development* proposal that would require adoption or amendment of a *land use plan* shall be reviewed in accordance with this division." Because, as discussed *ante*, the Project is consistent with the General Plan and the Community Plan, the Project does not require any adoption or amendment to a land use plan requiring review under Municipal Code section 122.0102. For the same reasons, Municipal Code section 121.0302(b)(3), also cited by Holden, is likewise inapplicable. Municipal Code section 121.0302(b) provides: "It is unlawful for any person to engage in any of the following activities, or cause any of the following activities to occur in a

19

(*San Franciscans Upholding*, *supra*, 102 Cal.App.4th at p. 678; *Sierra Club*, *supra*, 121 Cal.App.4th at pp. 1510-1511.) We are not persuaded by Holden's assertion that the General Plan's designations and density recommendations are not, in fact, "recommendations" but are instead absolute mandates setting forth rigid density ranges for development of property within City's boundaries. Further, because the Project is consistent with the General Plan, the Community Plan, and City's steep hillside development regulations, no project-specific land use plan was required for the Project. Thus, Municipal Code section 143.0115, cited by Holden, is inapplicable.[7] Holden does not show otherwise.

Finally, although Holden's opening brief alludes to his claim in the trial court that City did not comply with Government Code section 65863 in approving the Project, we conclude that Holden waived or forfeited that argument both in the trial court and on appeal. "When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived." (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852 (*Benach*).) Alternatively stated, "[w]here a point is merely asserted by [appellant] without any [substantive] argument of or authority for its proposition, it is deemed to be without foundation and requires no

_____

manner contrary to the provisions of the Land Development Code: [¶] . . . [¶] . . . [¶] (3) To change *density* or intensity of the use of land. . . ."

7  Municipal Code section 143.0115 provides in part: "Project-specific *land use plans* . . . proposed for sites where *environmentally sensitive lands* are present, are subject to the regulations in this section . . . ." (Mun. Code, § 143.0115(a).)

20

discussion." (*People v. Ham* (1970) 7 Cal.App.3d 768, 783 (*Ham*).) "Issues do not have a life of their own: if they are not raised or supported by [substantive] argument or citation to authority, we consider the issues waived." (*Jones v. Superior Court* (1994) 26 Cal.App.4th 92, 99 (*Jones*); see also *Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956 (*Cahill*) [same]; *Landry v. Berryessa Union School Dist.* (1995) 39 Cal.App.4th 691, 699-700 (*Landry*) ["[w]hen an issue is unsupported by pertinent or cognizable legal argument it may be deemed abandoned and discussion by the reviewing court is unnecessary"].) The record shows that Holden raised Government Code section 65863 in the trial court only in a footnote in his opening brief and without any substantive legal analysis. In footnote 4 on page 9 of that trial court brief, Holden stated: "The General Plan's expansive direction to enforce residential density minimums is aligned with the State's legislative prohibition against the reduction of residential densities. [(Gov. Code [,] § 65863[)]. We note the City simply ignores this statutory requirement notwithstanding its inconsistency with the General Plan. [(]Gov. Code [,] § 65863 [subd.] (b)(1), (2) [)]." Holden neither quoted the relevant language of that statute nor provided any substantive legal analysis showing that City was required to comply with that statutory provision and failed to do so. Because Holden did not adequately raise and discuss the Government Code section 65863 issue in the trial court, he is precluded from raising that issue on appeal. (*Mattco Forge, Inc. v. Arthur Young & Co.* (1997) 52 Cal.App.4th 820, 847; cf. *Benach* at p. 852 [waiver of issue on appeal for absence of substantive analysis]; *Jones*, at p. 99 [same].)

Holden's opening brief also failed to provide any substantive legal analysis showing that City erred in its purported noncompliance with Government Code section 65863. In support of his argument that "[p]roposals to develop below the designated range could similarly result in uneven development relative to neighboring properties and reduce much-needed housing in a time of historic shortage," Holden cites to Government Code section 65863 and then describes its substance in brackets as follows: "[requiring cities to ensure that regional housing needs be met through the implementation of their general plans with regard to individual residential developments]" and then refers us to footnote 2.[8] An appellant cannot bury a substantive legal argument in a footnote and hope to avoid waiver of that argument. (*Sabi v. Sterling* (2010) 183 Cal.App.4th 916, 947 ["Footnotes are not the appropriate vehicle for stating contentions on appeal."]; *Unilogic, Inc. v. Burroughs Corp.* (1992) 10 Cal.App.4th 612, 624, fn. 2 ["We do not view as adequate to preserve an issue on appeal . . . one footnote mention of [it]"];

---

[8]    Footnote 2 on page 14 states: "We note here that the City, [IDEA], and the trial court, all failed to address [Holden's] claim that the approval of the Project violates Government Code [§] 65863. . . . This provision prohibits cities from allowing residential development of any parcel at lower residential densities absent certain findings which the City failed [to] make with regard to the Project's approval. (Gov. Code[,] § 65863 [subd.] (b)(1) [requiring that an action which permits the reduction of density below the range defined in a general plan must include findings that (1) declare consistency with the housing element; and (2) identify remaining sites in the housing element in a manner quantifiably sufficient to accommodate the City's share of the regional housing needs at each income level, and define the remaining capacity of existing site to meet these housing needs by income level.]; Gov. Code[,] § [65863] [subd.] (g)(1), (2).) The administrative record[] shows that the City violated this provision of state law. The City's and [IDEA's] silence on these points infer they do not contest this violation."

22

*Alexander v. Exxon Mobil* (2013) 219 Cal.App.4th 1236, 1260, fn. 10 [argument raised in footnote without analysis or discussion is waived]; *Roberts v. Lomanto* (2003) 112 Cal.App.4th 1553, 1562 [assertions raised only in footnote may be properly disregarded]; *Evans v.* Centerstone *Development Co.* (2005) 134 Cal.App.4th 151, 160 ["We do not have to consider issues discussed only in a footnote."].)  Because Holden does not provide any proper substantive legal analysis on his Government Code section 65863 claim, we consider it to be forfeited or waived and therefore disregard it and do not address its merits.  (*Benach*, *supra*, 149 Cal.App.4th at p. 852; *Ham*, *supra*, 7 Cal.App.3d at p. 783; *Jones*, *supra*, 26 Cal.App.4th at p. 99; *Cahill*, *supra*, 194 Cal.App.4th at p. 956; *Landry*, *supra*, 39 Cal.App.4th at pp. 699-700.)

III

*City's Approval of the Project*

Relying on many of the same arguments discussed *ante*, Holden contends that City erred by approving the Project because it did not comply with the General Plan's designation and density recommendations that apply to its site.  We rejected those arguments in section II, *ante*.  Incorporating our discussions of those arguments herein, we conclude that City did not err by finding that the Project was consistent with the General Plan's density designations and recommendations and, based thereon, approving the Project.  The trial court thus did not err in denying Holden's petition for writ of mandate.

DISPOSITION

The judgment is affirmed.


AARON, J.

WE CONCUR:


HALLER, Acting P. J.


GUERRERO, J.

Filed 12/13/19

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| LARK HOLDEN, | D074474 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-2017-00018417-CU-TT-CTL) |
| CITY OF SAN DIEGO et al., | |
| Defendants and Respondents; | ORDER CERTIFYING OPINION FOR PUBLICATION |
| IDEA ENTERPRISE, LP, | |
| Real Party in Interest and Respondent. | |

THE COURT:

The opinion in this case filed on December 3, 2019, was not certified for publication. It appearing the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), the request pursuant to rule 8.1120(a) for publication is GRANTED.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to Be Published in the Official Reports" appearing on page one of said opinion be deleted and the opinion herein be published in the Official Reports.

_____

HALLER, Acting P. J.

Copies to:  All parties

2