Filed 12/18/25  North County Advocates v. City of Carlsbad CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| NORTH COUNTY ADVOCATES, | D083749 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-2019-00042954-CU-MC-NC) |
| CITY OF CARLSBAD, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of San Diego County, Robert P. Dahlquist, Judge.  Affirmed.

DeLano & DeLano, Everett L. DeLano III and Ezgi Kuyumcu for Plaintiff and Appellant.

Cindie K. McMahon; The Sohagi Law Group, Margaret M. Sohagi, R. Tyson Sohagi and Mark J.G. Desrosiers for Defendant and Respondent.

## INTRODUCTION

Voters in the City of Carlsbad (City) passed Proposition E in 1986 to limit the number of new dwelling units in the City, specifying the rate at which that limit would be reached was governed by developers' ability to

provide public facilities such as schools, parks, open space, streets, and sewers in the areas of any proposed new construction. The initiative provided: "The City Council or the Planning Commission shall not find that all necessary public facilities will be available concurrent with need as required by the Public Facilities Element and the City's 1986 *growth management plan* unless the provision of such facilities is guaranteed." (Italics added.)

The 1986 growth management plan (GMP) referenced in Proposition E is a collection of planning documents and included, at minimum, an ordinance and two resolutions approved by Carlsbad's City Council earlier in 1986, *before* Proposition E was presented to the voters. Ordinance No. 9808 added a new chapter, entitled "Growth Management" to the City's Municipal Code. It required the City Council to adopt various plans and "performance standards" for ensuring the City has adequate infrastructure and facilities. Ordinance No. 9808 also expressly reserved to the City discretion to amend the plans and their related performance standards, as necessary, in the future.

In 2019, North County Advocates (NCA), a non-profit corporation, sued the City for its alleged failure to comply with Proposition E and the GMP as it relates to the 1986 performance standards for parks, open space, and traffic circulation. After a bench trial, the trial court ruled NCA was not entitled to the declaratory and injunctive relief it sought. The court determined Proposition E, as enacted, did not bind the City to the 1986 performance standards and that, under Ordinance No. 9808, the City retained the authority to amend the standards. The City did amend the relevant standards and, as amended, it was in compliance with both Proposition E and

2

its GMP. On our de novo review, we reach the same conclusion and affirm the judgment.

BACKGROUND

I.

*The 1986 GMP*

As required by state law, the City has a comprehensive, long-term plan that governs the physical development of the City's land (General Plan) and includes "the mandatory elements" specified in Government Code section 65302. (Gov. Code, §§ 65300–65302.) These elements include land use, traffic circulation, housing, conservation, open space, noise, safety, and environmental justice. (*Id.*, § 65302.) To implement certain elements of the General Plan and to ensure the City grew in a controlled manner with sufficient public facilities and improvements, the City enacted the GMP.

As mentioned, the GMP consists of multiple planning documents, including Ordinance No. 9808 (Ordinance) and two resolutions—Resolutions 8796 and 8797—which created the Citywide Facilities and Improvements Plan (Citywide Plan) detailing the performance standards and the Local Facilities Management Plans (Local Plan(s)) to apply the performance standards to each of the City's 25 zones. We discuss these documents in further detail next.

A.  *Ordinance No. 9808*

In January 1985, the City Council undertook a "comprehensive review of the Land Use Element of its General Plan." As a result, on July 1, 1986,

3

the City Council adopted the Ordinance to establish a GMP by adding Chapter 21.90 to the Carlsbad Municipal Code.[1]

The City Council determined "demand for facilities and improvements ha[d] outpaced the supply resulting in shortages in public facilities and improvements, including but not limited to streets, parks, [and] open space." (§ 21.90.010, subd. (b).) To "eliminate the shortages," "ensure that no development occurs without providing for adequate facilities and improvements, [and] to regulate the pace of development" (§ 21.90.010, subd. (c)), the Ordinance was enacted to implement the following City policies: "(1) Provide quality housing opportunities for all economic sectors of the community; (2) Provide a balanced community with adequate commercial, industrial, recreational and open space areas to support the residential areas of the City; (3) Ensure that public facilities and improvements . . . are available concurrent with the need created by new development; (4) Balance the housing needs of the region against the public service needs of Carlsbad residents and available fiscal and environmental resources; (5) Encourage infill development in urbanized areas before allowing extensions of public facilities and improvements to areas which have yet to be urbanized; (6) Ensure that all development is consistent with the . . . [G]eneral [P]lan; (7) Prevent growth unless adequate public facilities and improvements are provided in a phased and logical fashion as required by the general plan; (8) Control . . . the timing and location of development by tying the pace of development to the provision of public facilities and improvements at the times established by the [Citywide Plan]." (§ 21.90.010, subd. (a).)

---

[1] Undesignated statutory references are to Chapter 21.90 of the Carlsbad Municipal Code as originally passed and contained in the record.

To achieve these policy goals, the Ordinance "prohibit[ed] development until adequate provisions for the public facilities and improvements are made by developers of projects within the City, and by giving development priority to areas of the City where public facilities and improvements are already in place (infill areas)." (§ 21.90.010, subd. (d).)

The Ordinance required the City Council to adopt performance standards for each facility or improvement, to prepare the Citywide Plan, and to divide the City into 25 zones with a Local Plan prepared for each zone. (§§ 21.90.080, 21.90.090, 21.90.100, 21.90.110.)

Specifically, section 21.90.080 provided that the City Council shall adopt: (1) "general performance standards for each facility or improvement"; (2) "[s]pecific performance standards for citywide facilities" as part of the Citywide Plan; and (3) "[s]pecific performance standards for each zone" of the Local Plans. Facilities and improvements included sewer systems, water, drainage, circulation, fire facilities, governmental administration facilities, schools, parks and other recreational facilities, libraries, and open space. (§§ 21.90.080, 21.90.090, subd. (b), 21.90.110, subd. (c).) The failure to meet the performance standards in a zone would preclude the issuance of development or building permits in that zone "until the performance standard is met or arrangements satisfactory to the City Council guaranteeing the facilities and improvements have been made." (§ 21.90.080.)

Section 21.90.090, subdivision (a), required the City Council to adopt a Citywide Plan "[t]o implement the City's [G]eneral [P]lan by securing provision of facilities and improvements, and to ensure that development does not occur unless facilities and improvements are available." To this end, the Citywide Plan was required to, among other things, "[i]dentify all

5

facilities and improvements necessary to accommodate the land uses specified in the [G]eneral [P]lan and by the zoning; specify size, capacity and service level performance standards for the identified facilities and improvements; establish specific time tables for acquisition, installation and operation of the facilities and improvements correlated to projected population growth, facility, and improvement performance standards, and projected nonresidential development."

Section 21.90.100, subdivision (a), required the City Council to divide the City into 25 "[l]ocal facilities management zones" (zone(s)). (§ 21.90.100, subds. (a), (c).) Each zone would have a Local Plan to "show how and when [certain] facilities and improvements necessary to accommodate development within the zone will be installed or financed" to implement the Citywide Plan and General Plan. (§ 21.90.110, subds. (a), (c), (d).) Each Local Plan would establish "that development in the zone will not reduce the facilities or improvements capabilities or create facilities or improvements shortages in other zones or reduce service capability in any zone below the performance standard which is established pursuant to Section 21.90.080." (§ 21.90.110, subd. (d).)

Critical in this appeal, section 21.90.130, subdivision (b), expressly reserved discretion to the City Council to make any necessary amendments to the Citywide Plan and Local Plans. It provided: "The [Citywide Plan] and [Local Plans] process is part of the City's ongoing planning effort. *It is anticipated that amendments to the plans may be necessary.* Adoption of a facilities management plan does not establish any entitlement or right to any particular general plan or zoning designation or any particular development proposal. The [Citywide Plan] and [Local Plans] are guides to ensure that no development occurs unless adequate facilities or improvements will be

6

available to meet demands created by development.  The City Council *may initiate an amendment to any of the plans at any time if in its discretion it determines that an amendment is necessary* to ensure adequate facilities and improvements."  (§ 21.90.130, subd. (b), italics added.)

The Ordinance required the City Manager to report deficiencies in any zone to the City Council.  (§ 21.90.130, subd. (c).)  If the City Council agreed such a deficiency existed, "no further building or development permits shall be issued within the affected zone or zones and development shall cease until an amendment to the [Citywide Plan] or applicable [Local Plan] which addresses the deficiency is approved by the City Council and the performance standard is met."  (*Ibid.*)  In addition, the Planning Director was required to "monitor the development activity for each . . . zone" and "prepare an annual report to the City Council consisting of maps, graphs, charts, tables and text and which includes a developmental activity analysis, a facilities and improvements adequacy analysis, a facility revenue/expenditure analysis and recommendation for any amendments to the facilities management plan." (§ 21.90.130, subd. (d).)  The City Council would determine the content of the annual report.  (*Ibid.*)

B.    *Resolutions 8796 and 8797*

In September 1986, the City Council adopted Resolutions 8796 and 8797 to implement the GMP, as required by the Ordinance.[2]

Resolution 8796 adopted performance standards for 11 different types of public facilities pursuant to section 21.90.080.  Three performance standards are relevant to this appeal:  open space, parks, and traffic circulation.  We discuss these standards in further detail later in this opinion.

---

[2]    Three additional resolutions involved establishing the zones and preparing the Local Plans.

7

Resolution 8797 adopted the Citywide Plan as required by section 21.90.090. The Citywide Plan would "implement the City's General Plan and Zoning Ordinance by ensuring that development does not occur unless adequate public facilities and services exist or will be provided concurrent with new development." The Citywide Plan established service level requirements for public facilities and improvements, including the open space, parks, and circulation performance standards, based on projections of future development. It also determined the boundaries of the 25 zones.

The Citywide Plan provided that when facilities and improvements did not meet the performance standard in a zone, the Local Plan would provide a means for meeting the standard or development in the zone would be suspended until it met the standard.

## II.

### *The 1986 Performance Standards*

As adopted in 1986, the parks performance standard provided: "Three acres of community park or special use park per 1,000 population within the Park District, must be scheduled for construction within a five[-]year period." Under this standard, the City was split into four quadrants, each of which was required to provide sufficient park acreage for its population. For the parks buildout projection, the Citywide Plan allocated "credit" for one large park—Macario Canyon Park, later Veterans Memorial Park—to each of the quadrants. The parks calculation also included acreage from school grounds.

The traffic circulation performance standard provided: "No road segment or intersection in the zone nor any road segment or intersection out of the zone which is impacted by development in the zone shall be projected to exceed a service level C during off-peak hours, nor service level D during

8

peak hours.  Impacted means where 20% or more of the traffic generated by the local facility management zone will use the road segment or intersection."

The open space performance standard provided:  "Fifteen percent of the total land area in the zone exclusive of environmentally constrained nondevelopable land must be set aside for permanent open space and must be available concurrent with development."  "Environmentally constrained" essentially means the land cannot be developed due to its characteristics, including "[b]eaches, wetlands, floodways, other water bodies, riparian and woodland habitats, slopes greater than 25%, major roadways, railroad tracks, and major powerline easements."  The Citywide Plan included a map of the zones "highlight[ing] those areas of the city which will be required to comply with the open space performance standard" because "[t]he other areas of the city are already developed or meet or exceed the requirement."  The zones that were "required to comply" with the standard would have to "detail in their local plan how they will meet this standard."

III.

*Proposition E*

In the November 1986 election, the City's voters passed Proposition E, which the City Council then enacted on December 2, 1986.  (*Concerned Citizens v. City of Carlsbad* (1988) 204 Cal.App.3d 937, 939–940.)  "Proposition E limited to 33,478 the total number of new dwelling units in the city.  Under Proposition E, the rate at which that limit would be reached was governed by the willingness and ability of developers to provided public facilities such as schools, parks, open space, streets and sewers in the areas where they proposed new construction.  In particular, no new units could be constructed unless a builder was willing to finance facilities the [C]ity had previously determined would be necessary to support the population density

9

that would result from the new development.  In the alternative, a builder could show that the necessary facilities already existed." (*Ibid.*)

The ballot material for Proposition E presented voters with the following question:

> "Shall an ordinance be adopted to provide as a part of the 1986 growth management plan that 1) NO DEVELOPMENT SHALL BE APPROVED by the City of Carlsbad unless it is guaranteed that concurrent with need all necessary public facilities be provided as required by said plan with emphasis on ensuring good traffic circulation, schools, parks, libraries, open space and recreational amenities; and 2) the City Council shall not approve residential development which would increase the number of dwelling units beyond the limit in said ordinance WITHOUT AN AFFIRMATIVE VOTE OF THE CITIZENS. The City may add additional public facilities.  The City shall not reduce public facilities without a corresponding reduction in the residential dwelling unit limit."

The text of the "PROPOSED ORDINANCE" to be enacted with the passage of Proposition E followed that question.  Relevant here, the initiative stated the City's General Plan "shall be amended by the amendment of the Public Facilities and Land Use Elements to add the following:"

> " 'The City of Carlsbad in implementing its public facilities element and growth management plan has made an estimate of the number of dwelling units that will be built as a result of the application of the density ranges in the Land Use Element to individual projects.  The City's Capital Improvement Budget, growth management plan, and public facilities plans are all based on this estimate.  In order to ensure that all necessary public facilities will be available *concurrent with need* to serve new development it is necessary to limit the number of residential dwelling units which can be constructed in the City to that estimate. For that purpose the City has been divided into four quadrants along El Camino Real and Palomar Airport Road.  The maximum number of residential dwelling units to be constructed or approved in the City after November 4,

10

1986 is as follows; Northwest Quadrant 5,844; Northeast Quadrant 6,166; Southwest Quadrant 10,667; Southeast Quadrant 10,801.

"'The City shall not approve any General Plan amendment, zone change, tentative subdivision map or other discretionary approval for a development which could result in development above the limit in any quadrant.  In order to ensure that development does not exceed the limit the following growth management control points are established for the Land Use Element density ranges.'"

Proposition E then set forth a chart with the growth management control points with "ALLOWED DWELLING UNITS PER ACRE."  It next provided that:

"The City shall not approve any residential development at a density that exceeds the growth management control point for the applicable density range without making the following findings:

"1.  That the project will provide sufficient additional public facilities for the density in excess of the control point to ensure that the adequacy of the City's public facilities plans will not be adversely impacted.

"2.  That there have been sufficient developments approved in the quadrant at densities below the control point to cover the units in the project above the control point so the approval will not result in exceeding the quadrant limit.

"The City Manager shall monitor all approvals and report the Planning Commission and City Council on an annual basis to ensure that the construction of residential units within each quadrant, on a cumulative basis, will be at or below the growth management control points and that the overall quadrant limits are being maintained.  If the annual report indicates in any way that it is likely that the limit may be exceeded, the Council shall take appropriate action by revisiting the growth management plan and the

11

City's zoning code to ensure that the ceilings will be maintained.

> "The City Council or the Planning Commission shall not find that all necessary public facilities will be available *concurrent with need* as required by the Public Facilities Element and the City's 1986 growth management plan unless the provision of such facilities is guaranteed. In guaranteeing that the facilities will be provided emphasis shall be given to ensuring good traffic circulation, schools, parks, libraries, open space and recreational amenities. Public facilities may be added. The City Council shall not materially reduce public facilities without making corresponding reductions in residential densities." (Italics added.)

Finally, Proposition E provided that "building permits issued or approved for residential dwelling units in the City after November 4, 1986 shall not exceed the limits" established in each of the four quadrants and that those numbers "shall not be increased without an affirmative vote of the people."

Notably, the "concurrent[ ] with need" requirement referenced in Proposition E already existed in section 21.90.040, subdivision (c). Section 21.90.040, subdivision (c), provided: "The requirements of this chapter are imposed as a condition of zoning on the property to ensure implementation of and consistency with the general plan and to protect the public health, safety and welfare by ensuring that public facilities and improvements will be installed to serve new development prior to or concurrently with need."

The ballot argument in favor of Proposition E stated:

> "Most people agree that the pace of growth in Carlsbad has been so fast that a moratorium on building was needed. The moratorium gave Carlsbad time to find an intelligent way to plan future growth. The result is Proposition E, which puts strict rules on the books – rules that can't change unless you, the voter, change them.

12

"Proposition E puts a permanent cap on the total number of residential units that can be built in Carlsbad; reduces the overall density of the city and guarantees that we will always be a low density residential community with 40% open space.  NO DEVELOPMENT SHALL BE APPROVED unless all required public facilities are provided up front.

"Proposition E guarantees that the cost of needed public facilities will be paid by land developers and future homeowners – not by current Carlsbad taxpayers. Proposition E gives us controlled growth without increased taxes and without destroying our property values or beautiful community.

"[¶] . . . [¶]

"Now is the time to put strict limits on development and a cap on our future growth. . . ."

Proposition E itself does not contain an open space percentage requirement.

IV.

*Current Performance Standards (as Amended)*

Since the adoption of the performance standards and the passage of Proposition E in 1986, the City has amended the parks and circulation performance standards. As amended, the current performance standards for parks, circulation and open space are as follows:

A.    *Circulation Performance Standard*

In September 2015, the City amended its circulation performance standard to require that the City:[3] "Implement a comprehensive livable streets network that serves all users of the system – vehicles, pedestrians, bicycles and public transit. Maintain LOS D or better for all modes that are subject to this multi-modal level of service (MMLOS) standard, as identified

---

[3]    The amendment to the circulation performance standard was part of a General Plan amendment and related updates adopted by the City Council.

14

in Table 3-1 of the General Plan Mobility Element, excluding LOS exempt intersections and streets approved by the City Council."[4]

The City made these amendments to the circulation performance standard to conform with the California Complete Streets Act (2008), which required that cities "plan for a balanced, multi-modal transportation system that meets the needs of all travel modes." The change reflected the consideration of "mobility needs of pedestrians, bicyclists, transit users, and vehicles," rather than the singular focus on vehicles provided in the prior performance standard. Because "competing interests . . . arise when different travel modes mix," the Citywide Plan explained, "optimum service levels cannot be provided for all travel modes on all streets within the city."

At that time, the City identified six street segments that would not comply with the new circulation performance standard. Rather than further widening already wide streets, the City opted to exempt portions of the streets from the standard and implement transportation management techniques instead. In 2019, 2020, and 2021, the City Council passed additional resolutions containing street exemptions from the circulation performance standard.

B.  *Parks Performance Standard*

In March 2017, the City made amendments to the parks performance standard pursuant to the parties' settlement of an earlier lawsuit filed by

---

[4]  LOS, or level of service, was the measure of transportation performance. Performance was measured on a scale of A through F, with A being the highest. Initially, the performance standard focused on the level of service for vehicles. The amendment to the multimodal level of service required the evaluation of multiple forms of transportation, including vehicles, pedestrians, bicycles, and mass transit. At the time of trial, the City was in the process of revising its non-vehicular level of service methodology, which it had to establish without any existing industry standard.

NCA against the City in 2015.  In that earlier lawsuit, NCA alleged the City's 2015 updates violated Proposition E and the GMP, including as it related to parks, open space, and circulation performance standards.  (Super. Ct. San Diego County, No. 37-2015-00035458-CU-WM-NC).

As required by the settlement, the City amended the parks performance standard "to provide that the five-year timing requirement for park construction shall commence on the date the City Council approves the GMP parks performance standard amendment."  Previously, pursuant to a 1997 resolution, parks were "scheduled for construction" when the facility has been designed, a site selected, and a financing plan approved.

After the 2017 settlement, the City also began issuing open space reports, beginning with a report for Fiscal Year 2017–2018.  These reports listed the amount of open space in each zone and the citywide total by General Plan category,[5] the total amount of open space, the total amount of land in the zone, and the resulting percentage of open space in each zone.

As amended, the current parks performance standard provides:  "Three acres of Community Park or Special Use Area per 1,000 population within the Park District must be scheduled for construction within a five-year period beginning at the time the need is first identified.  The five-year period shall not commence prior to August 22, 2017."  Thus, the compliance deadline for the parks performance standard would be August 22, 2022.  In addition to the performance standard amendment, the related section of the updated Citywide Plan reflects the 1997 definition of "scheduled for construction" to

---

[5]    The City's General Plan divides open space into four categories: Category 1:  Open Space for Preservation of Natural Resources; Category 2: Open Space for Managed Production of Resources; Category 3:  Open Space for Outdoor Recreation; and Category 4:  Open Space for Aesthetic, Cultural and Educational Purposes.

16

mean "that the improvements needed to meet the demand have been designed, that a site has been selected and has been acquired or is being acquired, and that a financing plan for construction of the facility has been approved by the City Council."

C.     *Open Space Performance Standard*

The open space performance standard has not been substantively amended since its original adoption in 1986. It still provides: "Fifteen percent of the total land area in the Local Facility Management Zone (LFMZ) exclusive of environmentally constrained non-developable land must be set aside for permanent open space and must be available concurrent with development." But as part of the 2017 settlement, the City began, as required, annually releasing a report on open space in each zone of the City using General Plan open space categories.

V.

*NCA's Operative Complaint and the City's Answer*

In August 2019, NCA filed the operative complaint for declaratory and injunctive relief. Relying on the 1986 performances standards, NCA alleged the City was in violation of Proposition E and the GMP as to three public facilities—open space, parks, and traffic circulation. The City, according to NCA, continued to approve development in violation of Proposition E and the GMP despite not meeting the performance standards for these facilities.

Specifically, as to open space, NCA alleged the City was failing to meet the 15 percent open space per zone required by the 1986 performance standard because the City was improperly counting environmentally constrained lands (such as beaches, wetlands, and other water bodies) and

17

required community parks and school playgrounds toward the 15 percent.[6] Additionally, NCA asserted Proposition E "guaranteed" that 40 percent of the City "would always remain open space and no development could be approved by the City unless open space and all other necessary public facilities are provided." It alleged the City was failing to meet that 40 percent guarantee, as the City had reported for the Fiscal Year 2017–2018 that "the total open space percentage is 37.9% of total acreage, leaving the City 2.1% short," or "approximately 525.6 acres of missing open space." And its website states that "once all major new development is completed the total amount of open space will be between 38 and 39 [percent]."

As to parks, NCA alleged the City was failing to meet the 1986 performance standard in three of four quadrants. And, as to traffic circulation, NCA alleged the City was failing to meet the 1986 performance standard for eight roadway segments, including by exempting some segments from performance standards requirements and by failing to analyze intersections and non-peak hour service levels.

In its answer, the City denied it violated Proposition E and the GMP with respect to the 1986 open space, parks, and circulation performance

---

[6] While NCA's complaint only mentions schools in relation to the *open space* performance standard, the trial court's ruling noted that the City has questionably defined *parks* to include school grounds. While NCA's opening brief quotes that portion of the trial court's decision, NCA does not assert the argument that the City improperly counted school playgrounds toward open space or parks. For that reason, we deny as unnecessary the City's requests for judicial notice of the joint use agreement between the City Council and a school district regarding the use of the school's grounds as a public park and the General Plan Guidelines issued by the state of California which encourage such agreements.

standards.[7]  The City additionally asserted that no provision of Proposition E required 40 percent open space.  Throughout the litigation, the City maintained the position that Proposition E did not bind it to the 1986 performance standards, but it retained authority to amend them.

## VI.

### *Trial Court's Decision*

After a bench trial on the merits, the trial court issued a decision in favor of the City and denied NCA's requested relief.  The court found it dispositive that Ordinance No. 9808 allowed the City to amend the performance standards and concluded the City retained that authority after the passage of Proposition E.  The court explained that "Proposition E itself does not contain any performance standards," it "recites general growth management goals and aspirations," and "adopted a pre-existing growth management ordinance (Ordinance No. 9808), which delegates to the [C]ity [C]ouncil the authority to adopt and amend [the] performance standards."

---

[7]      In its answer, the City asserted a number of affirmative defenses, including that NCA's lawsuit was barred by the statute of limitations and by res judicata (claim preclusion) and collateral estoppel (issue preclusion) based, in part, on NCA's 2015 lawsuit.  The trial court ruled NCA's claims were not barred by claim preclusion because the 2015 litigation did not involve the same primary right as the current lawsuit.  It explained:  "This case challenges the implementation of the amended general plan rather than the adoption of planning documents and purported improper amendments to the general plan as was the case in the 2015 Petition."

On appeal, the City again asserts certain of NCA's claims are barred by the statute of limitations, claim preclusion, and issue preclusion, and that NCA forfeited certain claims by failing to obtain a ruling.  The City also contends the remedies NCA seeks violate state law.  Because we agree with the City that it retained the authority to amend the performance standards post-Proposition E and the City has reasonably amended and implemented its performance standards, we do not address the City's arguments on affirmative defenses, forfeiture, and remedies.

19

Thus, relying on *County of San Diego v. Commission on State Mandates* (2018) 6 Cal.5th 196, 209–210, 214 (*Commission on State Mandates*), *People v. Cooper* (2002) 27 Cal.4th 38, 43–44, fn. 4, and *Vallejo etc. R. R. Co. v. Reed Orchard Co.* (1918) 177 Cal. 249, 255, the court agreed with the City that it was permitted to change the 1986 performance standards "whenever it sees fit."

Based on this critical ruling, the court evaluated the evidence on NCA's claim as to the circulation, parks, and open space facilities and found the City was in compliance with the current performance standards.

First, the trial court found that although the City was not currently meeting the *1986* circulation performance standard, it had permissibly amended the performance standard and exempted "various street segments and intersections from complying with *any* performance standard," including many of the "main roads" in the City.

Second, as to parks, the trial court found the City was in compliance with the current performance standard but through modified (though "questionable") definition of what counts as a park and when parks are " 'scheduled for construction.' " "For example, the [C]ity has defined a 'park' to include, among other things, (1) fenced-in school grounds that are generally not accessible to the public; and (2) open fields if the fields have some sort of walking path or trail in them."[8] Additionally, the court accepted the City's position that "it is allowed [to] treat planned future parks toward the performance standard if it has 'scheduled' the future parks for construction, even though the parks do not exist now, and the scheduled completion date is far off into the future."

---

[8] As mentioned, NCA no longer asserts the City improperly counted school playgrounds toward parks. (See fn. 6, *ante*.)

Last, as to open space, the trial court found the City can claim compliance with the performance standard because it has exempted 17 of the 25 zones from the performance standard and "exclude[d] those zones that were 'already developed' in 1986 from compliance with *any* performance standard pertaining to open space."

As to each of these facilities, the trial court expressed its doubt the City was complying with the "spirt of Proposition E," i.e., "what the citizens had in mind when they voted to approve" the initiative. But, "[i]n hindsight, in order to bind the [C]ity to the 1986 performance standards, the citizens should have enacted an initiative that included those standards and also provided that the standards could not be changed except by another vote of the citizens." The court ultimately ruled NCA was not entitled to relief on its causes of action because the City was legally permitted to change the performance standards and exempt itself from them without violating Proposition E and the GMP.

## DISCUSSION

NCA contends "the City has taken many actions" inconsistent with Proposition E and the 1986 GMP. First, it argues the City did not have the authority to amend the parks and circulation performance standards following the passage of Proposition E and, even if it had some authority to amend, it exceeded the bounds of that authority. Second, NCA contends the City failed to satisfy the 1986 performance standards and other GMP requirements and violated Proposition E in the provision of parks, circulation, and open space facilities. Third, NCA contends the City has violated Proposition E because it materially reduced public facilities, a finding it claims the trial court made. Fourth, NCA asserts the City violated

21

Ordinance No. 9808 itself by failing to properly monitor and annually report on development activity.[9]

The City responds that Proposition E amended the General Plan, not the GMP, and the General Plan it amended is a flexible document with general goals; Proposition E did not adopt the already existing performance standards and the City retained authority to amend them; NCA asserts only that the City has violated its former, unamended parks and circulation performance standards; and the City is entitled to deference in the interpretation and implementation of its performance standards and has done so reasonably as to parks, circulation, and open space.

We agree with the City and the trial court that the City retained authority to amend the performance standards after Proposition E and has acted within that authority by amending them. NCA has not established any violations of Proposition E and the GMP.

---

[9] The City objected to NCA's belated discussion in its reply brief that it was entitled to declaratory relief requiring the City to amend the General Plan to include Proposition E's language. To the extent NCA contends the trial court erred by failing to provide that relief, we decline to consider that issue since, "[o]rdinarily, we do not consider arguments raised for the first time in a reply brief." (*People v. Mickel* (2016) 2 Cal.5th 181, 197.)

## I.

### *Standard of Review*

We review the trial court's factual findings following a bench trial for substantial evidence, viewing the evidence in the light most favorable to the prevailing party. (*Tribeca Companies, LLC v. First American Title Ins. Co.* (2015) 239 Cal.App.4th 1088, 1102.) We review disputes over statutory interpretation de novo. (*Ocean Street Extension Neighborhood Assn. v. City of Santa Cruz* (2021) 73 Cal.App.5th 985, 1025.)

In construing voter initiatives, like legislatively enacted statutory provisions, "we turn first to the language of the [initiative], giving the words their ordinary meaning. The initiative's language must also be construed in the context of the statute as a whole and the initiative's overall scheme. Absent ambiguity, we presume that the voters intend the meaning apparent on the face of an initiative measure and the court may not add to the statute or rewrite it to conform to an assumed intent that is not apparent in its language. Where there is ambiguity in the language of the measure, ballot summaries and arguments may be considered when determining the voters' intent and understanding of a ballot measure." (*Professional Engineers in California Government v. Kempton* (2007) 40 Cal.4th 1016, 1037 [cleaned up].) Likewise, we evaluate local regulations using the same principles. (*Berkeley Hills Watershed Coalition v. City of Berkeley* (2019) 31 Cal.App.5th 880, 897 (*Berkeley*).)

A government agency's interpretation of a statute, including an initiative, may be entitled to deference depending on the circumstances. (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 12; *Berkeley, supra*, 31 Cal.App.5th at p. 896 ["Greater deference is accorded an agency's interpretation where the agency has expertise and technical

23

knowledge, especially where the legal text to be interpreted is entwined with issues of fact, policy, and discretion since the agency is likely to be intimately familiar with regulations it authored and sensitive to the practical implications of one interpretation over another.  Deference is also appropriate when there are indications the agency's interpretation is likely to be correct." (cleaned up)].)

A government agency's interpretation and implementation of planning documents or ordinances it drafted are entitled to deference.  (*Ross v. California Coastal Com.* (2011) 199 Cal.App.4th 900, 929 (*Ross*) ["[T]he *commission* drafted and simultaneously certified the city's land use plan and Local Implementation Plan.  As noted, we grant broad deference to the commission's interpretation of the local coastal program it prepared."]; *Friends of Davis v. City of Davis* (2000) 83 Cal.App.4th 1004, 1015 ["[A]n agency's view of the meaning and scope of its own ordinance is entitled to great weight unless it is clearly erroneous or unauthorized."]; *Anderson First Coalition v. City of Anderson* (2005) 130 Cal.App.4th 1173, 1193 [an agency's interpretation of its own general plan and zoning ordinance are entitled to great weight].)

We review for abuse of discretion the City's determination whether an action, program, or project is consistent with its general plan.  (*San Francisco Tomorrow v. City and County of San Francisco* (2014) 229 Cal.App.4th 498, 513–514 (*San Francisco Tomorrow*).)  This rule applies to portions of the general plan amended by a voter initiative.  (*Id.* at pp. 515–516.)  We directly review the consistency determination without deference to the trial court's conclusions.  (*Pfeiffer v. City of Sunnyvale City Council* (2011) 200 Cal.App.4th 1552, 1563.)  An abuse of discretion occurs if the City's consistency determination "did not proceed legally, or if the determination is

24

not supported by findings, or if the findings are not supported by substantial evidence.  As for this substantial evidence prong, it has been said that a determination of general plan consistency will be reversed only if, based on the evidence before the local governing body, a reasonable person could not have reached the same conclusion." (*Clover Valley Foundation v. City of Rocklin* (2011) 197 Cal.App.4th 200, 238 [cleaned up].)  "When we review an agency's decision for consistency with its own general plan, we accord great deference to the agency's determination.  This is because the body which adopted the general plan policies in its legislative capacity has unique competence to interpret those policies when applying them in its adjudicatory capacity.  Because policies in a general plan reflect a range of competing interests, the governmental agency must be allowed to weigh and balance the plan's policies when applying them, and it has broad discretion to construe its policies in light of the plan's purposes." (*Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 142 [cleaned up].)

"[I]t is nearly, if not absolutely, impossible for a project to be in perfect conformity with each and every policy set forth in the applicable plan." (*Sierra Club v. County of Napa* (2004) 121 Cal.App.4th 1490, 1510–1511 (*Sierra Club*).)  If a "proposed project will be compatible with the objectives, policies, general land uses and programs specified in the applicable plan," an agency has "discretion to approve a plan even though the plan is not consistent with all of a specific plan's policies." (*Ibid.*)  Courts have explained "it is, emphatically, *not* the role of the courts to micromanage" consistency determinations of particular projects. (*San Francisco Tomorrow, supra,* 229 Cal.App.4th at pp. 517–518.)  Rather, "[o]ur function is simply to decide whether the city officials considered the applicable policies and the extent to

25

which the proposed project conforms with those policies, whether the city officials made appropriate findings on this issue, and whether those findings are supported by substantial evidence." (*Ibid.*) "Courts presume that the agency's decisions are correct." (*San Diego Citizenry Group v. County of San Diego* (2013) 219 Cal.App.4th 1, 11.) "The party challenging a city's determination of general plan consistency has the burden to show why, based on all of the evidence in the record, the determination was unreasonable."[10] (*Id.* at p. 26.)

## II.

### *The City's Authority to Amend the Performance Standards*

NCA asserts the trial court erred by ruling the City had the authority to amend the performance standards after Proposition E. It argues this is so because Proposition E specifically references the "1986 growth management plan," by stating, "The City Council or the Planning Commission shall not find that all necessary public facilities will be available concurrent with need as required by the Public Facilities Element and the City's 1986 growth management plan unless the provision of such facilities is guaranteed." We disagree. By using the term "1986 growth management plan," Proposition E did not incorporate the entirety of the 1986 GMP or the performance standards.

We begin with the important fact that section 21.90.130, subdivision (b), expressly provided amendment authority over the Citywide Plan and Local Plans to the City Council when necessary. Proposition E does

_____

10    The City acknowledges these cases involve consistency determinations of particular projects. We agree with the City that the same principles apply to the analysis whether the City is generally acting consistently with its planning documents.

26

not include any provision limiting that discretion.  By agreeing to the 2017 settlement that required the City to amend the parks performance standard, NCA recognized that continuing amendment authority.

*Commission on State Mandates, supra*, 6 Cal.5th 196, which both parties and the trial court relied on, involved an initiative that, as required by the California Constitution for statutes amended by initiative (Cal. Const., art. IV, § 9), restated with no or nonsubstantive changes certain code provisions containing state mandated duties on local governments. (*Commission on State Mandates*, at pp. 208–209.)  Whether the initiative changed the law on state mandated duties affected the ability of the Commission to issue a new decision contrary to its prior decision that certain expenses were reimbursable by the state.  (*Id.* at p. 204.)  Under Government Code section 17556, subdivision (f), the state need not reimburse local governments for state mandated costs " 'necessary to implement, or . . . expressly included in' " a voter initiative.  (*Id.* at p. 207.)  Thus, the California Supreme Court considered the issue of "what, precisely, qualifies as a mandate imposed by the voters."  (*Ibid.*)

In considering the issue, our Supreme Court looked to Government Code section 9605, subdivision (a)(1), which provided, "the portions of the amended section which are copied without change are not to be considered as having been repealed and again re-enacted, but to have been the law all along."[11]  (*Commission on State Mandates, supra*, 6 Cal.5th at p. 209

---

[11]  This section now reads:  "When a section or part of a statute is amended, it is not to be considered as having been repealed and reenacted in the amended form.  The unaltered provisions are to be considered as having been the law from the time when those provisions were enacted.  The new provisions are to be considered as having been enacted at the time of the amendment."  (Gov. Code, § 9605, subd. (a)(1).)

27

[cleaned up].)  The court also noted, "Article II, section 10, subdivision (c) of the California Constitution provides that an initiative statute may be amended or repealed only by another voter initiative, 'unless the initiative statute permits amendment or repeal without the electors' approval.'" (*Id.* at p. 211.)  Considering this law, the court concluded that when an initiative did not change the state mandated duties, but merely included their language as constitutionally required, the Legislature in most cases retains the power to amend the restated provision through the ordinary legislative process.  (*Id.* at p. 214.)  The Legislature may amend a technically restated statute "*unless* the provision is integral to accomplishing the electorate's goals in enacting the initiative or other indicia support the conclusion that voters reasonably intended to limit the Legislature's ability to amend that part of the statute." (*Ibid.*)  Thus, the court held that a statutory provision is not "'expressly included in . . . a ballot measure' within the meaning of Government Code section 17556, subdivision (f)," if it "was only technically reenacted as part of other changes made by a voter initiative *and* the Legislature has retained the power to amend the provision through the ordinary legislative process." (*Ibid.*)

*Commission on State Mandates* supports our conclusion that Proposition E did not integrate the GMP by merely referencing the somewhat informal name, "1986 growth management plan."  It did not restate the entirety—or indeed, any part of—the ordinances and planning documents that make up the "1986 growth management plan."  Nor was it required to do so. *Commission on State Mandates*, which unlike here dealt with an initiative containing the entire content of code provisions, does not hold an initiative that simply mentions the name of another document integrates that document into the measure.  Rather, only when the initiative restates

28

the language of preexisting provisions and those restated provisions are integral to the goals of the initiative is the Legislature then prohibited from amending the statute. Proposition E does neither.

Proposition E's reference to the "1986 growth management plan" clarified where to find the "concurrent with need" language that already existed in Ordinance No. 9808. Proposition E simply explains the term is found in the "1986 growth management plan" and that, to be concurrent with need, the facilities must be guaranteed. "[G]uaranteeing . . . the facilities" would require "emphasis" on "good" traffic circulation, parks, and open space. Proposition E does not further explain what constitutes "concurrent with need," nor does it limit the City's ability to otherwise interpret that term— even if integral to Proposition E. Proposition E did not amend or in any way reference the existing performance standards, or otherwise reference specific facilities and improvements. We therefore cannot say that the 1986 performance standards were incorporated into the ballot measure based on the mere reference to the "1986 growth management plan."

NCA also relies on the case *Shaw v. People ex rel. Chiang* (2009) 175 Cal.App.4th 577, 589 (*Shaw*), disapproved of on other grounds by

*Commission on State Mandates, supra*, 6 Cal.5th at p. 214, footnote 4.[12]
*Shaw* involved an initiative that amended Revenue and Tax Code
section 7102, allocating gas tax revenue to transportation uses. (*Shaw*, at
pp. 589–590.) The amended statute provided the Legislature may amend the
statute by two-thirds vote " '*if the statute is consistent with, and furthers the
purposes of, this section.*' " (*Id.* at p. 590.) The Legislature subsequently
amended the statute by adding subdivisions that reappropriated spillover
revenue to a non-transportation purpose. (*Id.* at p. 592.) In considering a
challenge to the amendment, the court construed the phrase " 'consistent
with, and furthers the purposes of this section,' " concluding the additional
subdivisions reappropriating funds were not consistent with and did not
further the purposes "of, the portion of section 7102 that they amend." (*Id.* at
pp. 601–602.)

*Shaw* also does not support NCA's position. There, the initiative
amended a statute and limited the Legislature's ability to further amend the
statute, which the Legislature subsequently did. Here, Proposition E added
language to the City's General Plan, limiting the Legislature's ability to
amend the initiative only as to a cap on residential dwelling units. NCA

12    The Supreme Court disapproved of *Shaw* "to the extent it is
inconsistent with [its] opinion." (*Commission on State Mandates, supra*,
6 Cal.5th at p. 214, fn. 4.) While the *Commission on State Mandates* court
agreed with the *Shaw* holding, *Shaw* includes dicta that is inconsistent with
*Commission on State Mandates'* holding. The *Shaw* court wrote that when a
statute is reenacted in its entirety, "any subsequent amendment to [the
statute] would require approval of the voters to be effective, except that [the
initiative at issue] expressly included conditional authority for Legislative
amendment." (*Shaw, supra*, 175 Cal.App.4th at p. 597.) The Supreme Court
disagreed that any technically reenacted portion of a statute would require
voter approval, concluding "the Legislature in most cases retains the power to
amend the restated provision." (*Commission on State Mandates*, at p. 214.)

takes issue with the City's amendments to the performance standards, which were not mentioned in Proposition E, not amendments to the General Plan, which Proposition E had amended. Proposition E, as part of the General Plan, establishes general goals—an "emphasis" on "good" facilities and improvements by "guaranteeing" them. Contrary to NCA's argument, the reference to the "1986 growth management plan" in Proposition E is not akin to the language limiting amendment at issue in *Shaw*. The initiative's explanation that the "concurrent with need" language is found in the "1986 growth management plan" did not prevent amendment of the performance standards in the GMP.

NCA also relies on the " 'well established principle of statutory law that, where a statute adopts by specific reference the provisions of another statute, regulation, or ordinance, such provisions are incorporated in the form in which they exist at the time of the reference and not as subsequently modified, and that the repeal of the provisions referred to does not affect the adopting statute, in the absence of a clearly expressed intention to the contrary.' " (*Palermo v. Stockton Theatres, Inc.* (1948) 32 Cal.2d 53, 58–59.) On the other hand, the " 'cognate rule' " provides that " 'where the reference is general instead of specific, such as a reference to a system or body of laws or to the general law relating to the subject in hand, the referring statute takes the law or laws referred to not only in their contemporary form, but also as they may be changed from time to time, and (it may be assumed although no such case has come to our attention) as they may be subjected to elimination altogether by repeal.' " (*Id.* at p. 59.) Regardless of the inclusion of the year, Proposition E's reference to the "1986 growth management plan" is a general reference to a system of planning ordinances and documents.

Our application of these principles in *People v. Superior Court (Gooden)* (2019) 42 Cal.App.5th 270 does not assist NCA.  There we noted "Proposition 7 did not include any time-specific limitations" when determining the reference at issue to be general, but we did not state that a time-specific reference would necessarily be *sufficient* to establish a limitation in every case.  (*Id.* at p. 283.)  In this case, where the reference is to an informal name of a group of planning ordinances and documents, without even defining the scope of the term, the inclusion of the year is not sufficient to make the reference specific.  In *Gooden*, we also "note[d] that Proposition 7 did not identify specific provisions of the Penal Code."  (*Ibid.*)  Here, Proposition E's reference to the "1986 growth management plan" did not specify any particular document, let alone a specific provision of a document.

In sum, Proposition E did not incorporate the entire "1986 growth management plan" or the performance standards, and that reference did not preclude the City from interpreting or modifying the parks or circulation performance standards.  Furthermore, the parties agree that Ordinance No. 9808 was part of the GMP.  As such, even if Proposition E did incorporate the entire GMP, it would include the section 21.90.130, subdivision (b), amendment authority.

III.

*The City's Implementation of the Performance Standards*

A.  *Parks*

As to parks, NCA contends:  (1) the City did not have the authority to amend the performance standard due to Proposition E's reference to the "1986 growth management plan"; (2) the City improperly amended the parks performance standard in its definition of the phrase "scheduled for construction"; and (3) the City may not apportion the acreage of Veterans

32

Memorial Park among the quadrants, and without doing so, the City is not meeting the parks standard in three of the four quadrants. The City responds that it has authority to amend the performance standards, it did amend the parks performance standard, NCA did not allege a violation of the existing standard, and the City has properly applied the amended standard. Indeed, in its 2019 complaint in this litigation and in this appeal, NCA alleged noncompliance with the 1986 parks performance standard, not the current standard.

As we have discussed, the City was permitted to amend the parks performance standard and did so as required by its settlement with NCA. The operative performance standard provided: "Three acres of Community Park or Special Use Area per 1,000 population within the Park District must be scheduled for construction within a five year period beginning at the time the need is first identified. The five year period shall not commence prior to August 22, 2017." Thus, compliance was not required until August 22, 2022. NCA cannot have alleged a violation of the existing performance standard when it initiated this litigation, in 2019. (See *Fix the City, Inc. v. City of Los Angeles* (2024) 100 Cal.App.5th 363, 375–376 [" '[C]auses of action do not accrue until *after* defendants have committed the wrongful act which gives rise to the cause of action in the first place.' "].)

NCA has not otherwise shown an unreasonable implementation of the parks performance standard. The City adopted a definition of its phrase "scheduled for construction" in its 1997 Resolution No. 97-435. The resolution defined the phrase "scheduled for construction" to "mean[ ] that the improvements have been designed, a park site has been selected, and a financing plan for construction of the facility has been approved." We

33

disagree that this definition violates Proposition E's requirement that public facilities be available "concurrent with need."

The City is entitled to deference when interpreting its own performance standards. The City's definition of "scheduled for construction" is consistent with Proposition E. Proposition E does not mandate facilities be in existence at the same time as residential construction—Proposition E does not address when a park is considered scheduled for construction or contain other guidance on the provision of parks. Proposition E only explains facilities must be "guaranteed" to be considered "available concurrent with need." The term "guaranteed" contemplates future construction of a facility, as an existing facility would not need to be guaranteed.

The City's decision to divide the acreage of Veterans Memorial Park by quadrant was also reasonable and supported by substantial evidence. Since the 1986 Citywide Plan, the City credited a quarter of the acreage of Veterans Memorial Park (formerly Macario Canyon Park) to each park quadrant. The Citywide Plan provided for this allocation despite the performance standard's language "within the Park District." NCA contends this language requires the park space to be located within the quadrant to count for that quadrant's park space.

But examining this language in the context of the entire performance standard, it is clear the language relates to the population within the quadrant, not the location of the park: " 'Three acres of community park or special use park *per 1,000 population within the Park District*.' " (Italics added.) This interpretation is consistent with the Citywide Plan's allocation of Macario Canyon Park acreage to each quadrant. NCA does not point to any provision in Proposition E or the GMP that prevents such an allocation of park space. Kyle Lancaster, the City's parks and recreation director,

34

provided evidence at trial that the allocation of park space was reasonable because the park space was centrally located and would benefit all four quadrants. As to parks, NCA has not shown a lack of compliance with the performance standard or a violation of Proposition E.

B.   *Circulation*

As to circulation, NCA first contends the 1986 circulation performance standard is in effect because the City did not have the authority to amend it following Proposition E. We have already rejected this argument. The current performance standard as to circulation requires the City to "[i]mplement a comprehensive livable streets network that serves all users of the system – vehicles, pedestrians, bicycles and public transit[ and m]aintain LOS D or better for all modes that are subject to this multi-modal level of service (MMLOS) standard, as identified in Table 3-1 of the General Plan Mobility Element, excluding LOS exempt intersections and streets approved by the City Council."

NCA claims the City is out of compliance with the existing circulation performance standard because it exempted streets from compliance and failed to analyze intersections. In 2015, the City's amendment changed the methodology to consider non-vehicle methods of travel to conform to state law. While the new standard continued to require a minimum standard of service, the standard explicitly permitted the City Council to exempt city streets and intersections.

Substantial evidence supports the conclusion that the City's decision to exempt certain street segments from the required service level of the new standard was reasonable. The City's transportation director, Thomas Frank, testified at trial that widening streets, as would be required to satisfy the performance standard for certain street segments, might attract more traffic

and result in cars driving higher speeds, rather than resolving traffic concerns. Further, wider streets make the transportation system more difficult and dangerous for pedestrians. Thus, in the July 2015 City Council General Plan Update, the City exempted certain four- and six-lane wide streets based on the finding that widening them further would be inconsistent with the goals of the plan. Instead of widening streets to resolve traffic concerns, Frank testified, the City required new developments to mitigate traffic in other ways, including implementing strategies that reduce reliance on single-occupant automobiles (encouraging working from home and carpooling; improving bicycle and pedestrian infrastructure), improving traffic signal coordination, and improving transit services.

NCA also claims the City is out of compliance with the existing circulation performance standard because it failed to analyze intersections. The evidence does not support NCA's argument. NCA complains the City ceased using "intersection LOS analysis" and started using "only street segment LOS analysis." (Underscore omitted.) Frank, however, explained at trial that the City continued to analyze intersections. Under the new analysis, intersections were *part of* the street segment.

As to circulation, we conclude NCA has not established a violation of the performance standard or Proposition E.

C.     *Open Space*

NCA contends the City has acted inconsistently with Proposition E and the GMP as to open space by: (1) treating Zones 1–10 and 16 as exempt from the open space performance standard, (2) failing to provide sufficient open space in certain zones, (3) failing to properly report whether the City met the open space performance standard; and (4) failing to maintain 40 percent of the City's land as open space.

No substantive amendments to the open space performance standard are at issue. The open space performance standard at the time of trial provided: "Fifteen percent of the total land area in the Local Facility Management Zone (LFMZ) exclusive of environmentally constrained non-developable land must be set aside for permanent open space and must be available concurrent with development."

1.    *Exempt Zones*

NCA first contends the City improperly treated zones as exempt from the open space performance standard. The Citywide Plan includes a "map highlight[ing] those areas of the city which will be required to comply with the open space performance standard" requiring the City to set aside 15 percent of land for permanent open space. The plan further lists the zones that must meet the standard as Zones 11 to 15 and 17 to 25. Because the Citywide Plan was prepared by the City's planning department, the planning department's interpretation is entitled to deference. (*Ross, supra*, 199 Cal.App.4th at p. 929 ["[T]he *commission* drafted and simultaneously certified the city's Land Use Plan and Local Implementation Plan. As noted, we grant broad deference to the commission's interpretation of the local coastal program it prepared."].) The City has reasonably interpreted its Citywide Plan based on its plain language. The clear implication is that Zones 1–10 and 16 need not comply with the 15 percent requirement. Eric Lardy, the division manager of the City's Planning Division, confirmed at trial these zones are not required to comply with the open space performance standard.

NCA points out that Lardy testified "that it was 'not accurate' to say [Zones 1 to 10 and 16] were 'exempt from the Growth Management Plan.' " While not exempt from *the GMP* as a whole, Lardy explained these zones are

37

exempt from *the open space performance standard*. He explained these zones were exempt from the standard because of "feasibility . . . in a fully-built-out zone." Otherwise, the City would be required to condemn, purchase, or otherwise acquire developable private land.

In addition, the exemptions predated Proposition E. Nothing in Proposition E prevented—or, indeed, addressed—these exemptions or the open space performance standard at all. Consequently, we conclude the City has reasonably interpreted the zone exemptions in its Citywide Plan and has not violated Proposition E as to open parks.

2. *Deficiencies by Zone*

NCA next contends it established deficiencies in the provision of open space in 20 zones by removing the Category 1 open space from the City's annual report, which resulted in open space percentages less than 15 percent. The 15 percent performance standard open space excludes "environmentally constrained nondevelopable land." NCA's argument assumes that General Plan Category 1 open space is the same as environmentally constrained nondevelopable land. Lardy explained at trial, however, that while there is "some overlap" between Category 1 Open Space and environmentally constrained nondevelopable land, the categories are not the same. He further testified that removing Category 1 open space was an improper way to analyze compliance with the open space performance standard because the City's open space charts do not report on performance standard open space. On review, we must view this evidence in the light most favorable to the City as the prevailing party. Further, NCA failed to present any evidence otherwise and has not sustained its burden to demonstrate a lack of compliance with the Citywide Plan.

38

NCA also notes that for Zones 12, 20, 21, and 22, the Local Plans show a different amount of total open space, including constrained (nondevelopable) and unconstrained (developed or developable), than the City's 2021–2022 annual report category of "Total LFMZ Open Space." We see no violation of Proposition E and the GMP for the following reasons.

NCA calculates the total open space for each zone by adding the "build out performance standard requirement for open space" (15 percent of the total developable land) as stated in the Local Plans and the amount of constrained (nondevelopable) land as stated in the Local Plans' projected build out constraints analysis. In that calculation, NCA used the full amount of constrained and half of the amount of partially constrained land. We are not convinced the Local Plans' constraints analyses translate to the amount of current constrained open space. Lardy testified that what is developable and unconstrained land may change over time. Nor are we convinced that inequality in these figures means an inadequate provision of open space. The basis for including half the amount of partially constrained land for the calculation of open space is unclear.

The "Open Space Facilities" section of the Local Plans state that "slopes 25-40% and major powerline easements that are improved for open space purposes can count for open space facilities"—meaning those spaces *can* count toward the 15 percent performance standard open space—yet NCA's calculation included the major powerline easements and half of the slope area in the calculation of constrained land. That land could be both constrained and open space performance standard land for the purposes of the annual open space report. In other words, these areas of land could be double counted in NCA's calculation from the Local Plans as compared to the actual amount of current open space. Additionally, the Local Plans discuss the build

39

out level of open space, not the current requirement. It is unclear which, if any, of these zones currently require the build out amount of performance standard open space.

NCA next contends that, even if exempt from the performance standards, Zone 3 has less open space than its Local Plan showed at that time. The 1987 Local Plan for Zone 3 states: "Zone 3 has 98.6 acres of land which are designated as Open Space in the Land Use Element of the General Plan." NCA complains the Annual Open Space Status Report for 2021–2022 states that there are 59 acres of LMFZ open space. The 1987 Local Plan, however, also states that the total zone acreage was 691.2, as compared to 625.4 total acres listed in the status report. The City explains in its brief that the original acreage was erroneous, based on inclusion of land not part of Zone 3. NCA does not dispute this. Overall, we cannot conclude from this information that the City has failed to maintain the proper amount of open space or otherwise violated the GMP.

In sum, NCA has not established deficiencies in the City's provision of open space in these zones based on Proposition E or the GMP.

3.    *Reporting*

NCA has not demonstrated a lack of compliance with the reporting requirements for open space. NCA points to section 21.90.130, subdivision (d): "The Planning Director shall monitor the development activity for each local facilities management zone and shall prepare an annual report to the City Council consisting of maps, graphs, charts, tables and text and which includes a developmental activity analysis, a facilities and improvements adequacy analysis, a facility revenue/expenditure analysis and recommendation for any amendments to the facilities management plan. The content of the annual report shall be established by the City Council."

40

NCA complains the recent annual reports on open space do not report whether each zone has met the 15 percent open space requirement. While the report must contain "a facilities and improvements adequacy analysis," the statute does not require any specific method of measurement. The City has reasonably been reporting open space in the manner agreed upon in the 2017 settlement, "summarized by General Plan open space category and Local Facilities Management Zone."

4.      *Total Open Space*

NCA also asserts the City has violated Proposition E by providing 38.1 percent open space rather than 40 percent. Proposition E itself, however, does not specify a total open space percentage that the City must maintain. It merely states the City must ensure "good" open space. The argument in favor of Proposition E states that the initiative would "reduce[ ] the overall density of the city and guarantee[ ] that we will always be a low density residential community with 40% open space." "If the language is not ambiguous, we presume the voters intended the meaning apparent from that language, and we may not add to the statute or rewrite it to conform to some assumed intent not apparent from that language. If the language is ambiguous, courts may consider ballot summaries and arguments in determining the voters' intent and understanding of a ballot measure." (*People v. Superior Court (Pearson)* (2010) 48 Cal.4th 564, 571.) While Proposition E established maximum numbers of residential dwelling units in each quadrant of the city and per acre, it did not address the acreage of open space compared to the total acreage of the city. Lardy confirmed at trial that the City is not required to have 40 percent of its total land set aside as open space.

41

We decline to consider Proposition E's silence on the total percentage of open space as an ambiguity in order to read language establishing a specific requirement in the initiative that does not exist. Proposition E, rather, provided general goals related to facilities and improvements, including that "guaranteeing" facilities would involve an "emphasis" on "good traffic circulation, schools, parks, libraries, open space and recreational amenities." These general policies and goals are consistent with the initiative being an amendment to the City's General Plan. (*Napa Citizens for Honest Government v. Napa County Bd. of Supervisors* (2001) 91 Cal.App.4th 342, 378 ["General plans ordinarily do not state specific mandates or prohibitions. Rather, they state 'policies,' and set forth 'goals.' "]; *Sierra Club, supra*, 121 Cal.App.4th at pp. 1510–1511.)

NCA has not established any violations of Proposition E or the GMP related to the City's provision of open space.

IV.

*Material Reductions*

Proposition E prohibits "material[ ] reduc[tions] [in] public facilities without making corresponding reductions in residential densities." NCA contends the City made and trial court found such material reductions in open space, parks, and circulation. We disagree the court made such findings.

While the trial court stated it "doubts" exempting intersections from the circulation standard and local zones from the open space performance standard was "what the citizens had in mind when they voted to approve Proposition E", and it "believes that the city is not adhering to the spirit of Proposition E with respect to parks," these statements of the trial court's

42

beliefs and doubts did not amount to a *finding* of *material* decreases in the provision of facilities.

Regardless, our interpretation of Proposition E is de novo, without consideration of the trial court's beliefs or doubts about it. Here, we emphasize that planning involves balancing a wide variety of interests and "it is nearly, if not absolutely, impossible for a project to be in perfect conformity with each and every policy set forth in the applicable plan." (*Sierra Club, supra*, 121 Cal.App.4th at pp. 1509–1510.)

As to parks, the Citywide Plan credited equal portions of Veterans Memorial Park to each park quadrant prior to Proposition E, and Proposition E did not purport to change this arrangement. The preexisting apportionment could not have been a reduction. Regarding circulation, Proposition E did not require any specific methodology, and adopting a performance standard implementing a multi-modal transportation system required by state law was reasonable. As to open space, Proposition E did not alter or refer in any way to the preexisting open space performance standards or exemptions. Because the exemptions predated Proposition E, the exemptions could not have been a material reduction.

Further, there is evidence in the record showing the City's decisions were reasonable. The division of Veterans Memorial Park is based on the park's central location and evidence that large parks have a regional benefit. NCA agreed to the delayed compliance deadline to meet the parks performance standard in the 2017 settlement agreement. It cannot now claim that deadline is an impermissible material reduction. The City chose to exempt certain street segments from the performance standard and required other forms of traffic mitigation when it was unable to obtain rights of way, compliance would negatively impact other community values or the

43

environment, or widening streets would leave them unsafe for pedestrians. As to open space, the zones were exempt because of the "feasibility" of meeting the standard "in a fully-built-out zone." None of these reasonable actions establish a material reduction in facilities and improvements.

V.

*Monitoring and Reporting*

Finally, NCA contends the City has failed to fulfill its obligation to monitor local facilities management zones for compliance with all performance standards and prepare an annual report on development, facilities, and improvements. Although NCA points to relevant requirements, it fails to point to evidence supporting its claim that the City's monitoring and reporting is deficient. The record includes Growth Management Program Monitoring Reports from the years 2009 through 2019, reporting on each performance standard. NCA misstates the monitoring requirement in part. In its reply brief, NCA asserts that "Section 21.90.130[, subdivision] (d) requires an annual report 'for each local facilities management zone.' " While that section requires the "Planning Director [to] monitor the development activity" in each zone, it does not require a separate report for each zone.

## DISPOSITION

The judgment is affirmed. The City is entitled to costs on appeal. (Cal. Rules of Court, rule 8.278(a)(2).)

DO, Acting P. J.

WE CONCUR:

CASTILLO, J.

RUBIN, J.